**FINANCIAL INFORMATION, INC.,**
**Plaintiff-Appellant,**

v.

**MOODY'S INVESTORS SERVICE,**
**INC., Defendant-Appellee.**

No. 285, Docket 86–7598.

United States Court of Appeals,
Second Circuit.

Argued Nov. 5, 1986.

Decided Dec. 22, 1986.

David A. Kalow, New York City (Arthur M. Lieberman, Lieberman, Rudolph & Nowak, New York City, of counsel), for plaintiff-appellant.

Robert M. Callagy, New York City (Mark A. Fowler, Satterlee & Stephens, New York City, of counsel), for defendant-appellee.

Before LUMBARD, OAKES and KEARSE, Circuit Judges.

LUMBARD, Circuit Judge:

In this case, before us for the second time, Financial Information, Inc. ("FII"), which publishes a financial reporting service, charged Moody's Investors Service, Inc. ("Moody's"), another financial publisher, with copyright infringement and unfair competition. After a bench trial, the District Court for the Southern District (Carter, J.) held for the defendants. It found that the material in question was copyrightable, but that Moody's made "fair use" of it under the copyright statute. In *Financial Information, Inc. v. Moody's Investors Service, Inc.*, 751 F.2d 501 (2d Cir.1984) (*Financial Information I*), we reversed and remanded for further factual findings to determine whether the material in question was copyrightable. On remand, Judge Carter found that FII's material was not copyrightable and also dismissed the plaintiff's pendent state claim. Because we agree that FII's service is not a copyrightable compilation and that the state claims were preempted by federal law, we affirm.

I.

The relevant facts are set forth at length in Judge Oakes' opinion cited above. FII is a financial publisher. One of its works is called the "Financial Daily Card Service," from which it alleges Moody's stole copyrighted information. This service (hereafter "Daily Bond Cards") consists of packets of 4″ by 6″ index cards on which are printed information regarding municipal bonds which the issuer has elected to redeem, or "call." The information typically includes the identity of the issuing authority, the series of bonds being called, the date and price of the redemption, and the name of the trustee or paying agent.

The Daily Bond Cards seek to report all municipal redemptions. When a municipality or other government body calls a bond for redemption—and, consequently, stops paying interest—it publishes a notice of the call in one or more newspapers. Because these notices are not published in a single place, the "back offices" of financial institutions, which are ill-equipped to keep track of thousands of call notices each year, subscribe to called bond services such as FII's. FII's approximately 500 subscribers pay $279 per year for the daily reports, an annual cumulative volume and a filing cabinet.

The defendant Moody's offers a service called the Municipal and Government News Reports ("News Reports"), a bi-weekly supplement to a yearly publication called the

Municipal and Government Manual. The Moody's publication provides substantially more information than FII's—including Moody's own rating of the quality of the bonds. In addition, unlike FII, Moody's does not seek to report on all municipal bond redemptions; it reports on only those bonds which the company also rates. The Moody's service costs $840 per year, which includes not only the bi-weekly news reports, but also the annual Municipal and Government Manual, which is a comprehensive work containing a great deal of financial information about municipalities. The Moody's publication serves a far wider audience than the Daily Bond Cards, including libraries and government agencies as well as financial institutions.

According to FII, it noticed in 1980 a "coincidence of Moody's errata publishing after FII," and suspected that Moody's was copying FII's data. In December of that year, FII began planting some false information in its Daily Bond Cards. Moody's reproduced seven of FII's ten common errors in 1980, and eight of eight errors in 1981. FII's expert witness stated that it was more than 95% certain that Moody's had copied 40–50% of FII's information in 1980 and 1981. Moody's, in response, presented substantial evidence of what it called the "independent creation" of its News Reports. It presented evidence that its research cost $700,000 to $1,000,000 per year.

The crucial issue on remand involved FII's efforts to produce its Bond Cards—which the district court described as a "simple clerical task." The cards contain only five basic facts about the bonds: the name of the issuer and a description of the bond (e.g. water, sewage, etc.); the redemption date; the redemption agent; the identification of the specific bonds being called, and the redemption price. Indeed, FII's advertising for its bond service called attention to the simplicity and conciseness of the cards, describing them as appearing in "outline form" without any "superfluous matter." As the district court found, "all [FII] does is provide its subscribers with the requisite bond redemption data in simplified form for easy and ready reference."

FII's procedure for collecting the information for its cards was as rudimentary as the cards themselves. The FII clerks usually did nothing more than look through newspapers and write down the redemption information from the "tombstone" advertisements. When the "tombstone" contained additional or unusually complex information, the clerks would simply attach a photocopy of the "tombstone" to the FII card. Occasionally, the FII clerks would telephone the issuers or agents to verify or clarify information.

Theresa Moore, a former FII researcher, testified at the initial trial that she and her colleagues were clerks with no special skills who exercised no discretion in their jobs. According to the district court, "[s]he used no subjective analysis, but 'just took the information from what I saw in the tombstones and the articles in the paper.'" Also at the first trial, the FII managing editor, George Sheekey, described the researchers' duties much as Moore did: he said their jobs consisted essentially of doing a simple, repetitive task by rote.

Following remand, the district court afforded FII another opportunity to describe its editorial processes. FII called only one witness, Frances Zawilski, an FII assistant editor who formerly supervised Theresa Moore. The district court found that Zawilski "gave a far more inflated version of [Moore's] training process as an FII researcher." The district court questioned the credibility of Zawilski's testimony, stating that "the court is now convinced that the testimony on remand was an attempt to enlarge and embellish a straight forward, simple but time consuming operation that had been fully and adequately explicated at the initial trial." Judge Carter concluded that "FII's researchers perform a simple clerical task. They go through the various publications, cut out the tombstones or redemption notices, extract from the notices the raw data—name of issuer, description of issue, redemption price, date, agent and serial number of bonds being called...."

The only selectivity involved is principally one of format.... With this data, there is no room for selection or choices or judgment." Accordingly, the court held that the Daily Bond Cards were not copyrightable.

## II.

Facts may not be copyrighted. The Copyright Act of 1976 does, however, expressly provide for the protection of "compilations," which are defined as works "formed by the collection and assembling of preexisting materials or of data that are selected, coordinated or arranged in such a way that the resulting work as a whole constitutes an original work of authorship." 17 U.S.C. § 101 (1982). The remand order instructed the district court to determine whether the Daily Bond Cards qualify as a copyrightable compilation.

Our leading case on the copyrightability of compilations is *Eckes v. Card Prices Update,* 736 F.2d 859 (2d Cir.1984). "Card Prices Update" was a publication which comprehensively listed all baseball cards manufactured from 1909 to 1979. The Guide listed 18,000 different cards and in each case furnished the author's estimation of the going market price. The Guide also gave the price for each card according to its condition: "mint, very good/excellent and fair/good." *Id.* at 860. In addition, the Guide divided all cards into premium (that is, valuable) and common (or less valuable) cards.

■ At the outset in *Eckes,* we noted our well-established reluctance to grant copyright protection to works of non-fiction—chiefly on the ground that facts may not be copyrighted. *See id.* at 862; *Hoehling v. Universal City Studios, Inc.,* 618

F.2d 972, 979 (2d Cir.), *cert. denied,* 449 U.S. 841, 101 S.Ct. 121, 66 L.Ed.2d 49 (1980); *Rosemont Enterprises, Inc. v. Random House, Inc.,* 366 F.2d 303, 310 (2d Cir.1966), *cert. denied,* 385 U.S. 1009, 87 S.Ct. 714, 17 L.Ed.2d 546 (1967). *See also Harper & Row Publishers, Inc. v. Nation Enterprises,* 471 U.S. 539, 105 S.Ct. 2218, 2224, 85 L.Ed.2d 588 (1985) (copyright protects only the expression of facts, not the facts themselves). We stated in *Eckes* that "we have been particularly restrictive in the protection of non-fiction works indicating, for example, that the fruits of another's labor in lieu of independent research obtained through the sweat of a researcher's brow, does not merit copyright protection absent, perhaps, wholesale appropriation." *Eckes, supra,* 736 F.2d at 862. The statute thus requires that copyrightability not be determined by the amount of effort the author expends, but rather by the nature of the final result. To grant copyright protection based merely on the "sweat of the author's brow" would risk putting large areas of factual research material off limits and threaten the public's unrestrained access to information.[1]

■ Applying these principles in *Eckes,* we concluded that the Report was copyrightable, stating that "[w]e have no doubt that appellants exercised selection, creativity and judgment in choosing among the 18,000 or so different baseball cards in order to determine which were the 5,000 premium cards." *Id.* at 863. Here, in contrast, the district court concluded that FII's efforts fell far short of those involved in the production of the "Card Prices Update." The district court's determination of whether the work was sufficiently original to merit copyright protection was one of fact. *See Original Appalachian Art-*

---

1. FII alleges that Moody's engaged in "wholesale appropriation" under *Eckes, supra,* 736 F.2d at 862. Judge Carter did not directly address the question of "wholesale appropriation," but it is fair to infer from his observation that "both FII and Moody's regularly used each other for source material" that he would have found no such action by Moody's. The record supports a finding of no "wholesale appropriation." At most Moody's used the FII information to pro-

vide one small piece of information for its News Reports. FII's expert witness testified that at the "statistical fringe," he would say that Moody's had copied 91% of the time, but that he was statistically certain that Moody's had copied only 40–50% of the time; Moody's submitted an exhibit demonstrating that of Moody's 1,400 called bond entries in one year, 789 could not possibly have come from copying FII.

*works, Inc. v. Toys Loft, Inc.*, 684 F.2d 821, 824–25 (11th Cir.1982). Relying in significant measure on its evaluation of the credibility of witnesses—which we are ill-disposed to disturb on appeal—the district court found that there was insufficient proof of "independent creation" to render the Daily Bond Cards copyrightable. The researchers had five facts to fill in on each card—nothing more and nothing less.[2] They sometimes did minor additional research in order to find these facts, but little "independent creation" was involved. This conclusion is amply supported by the record and certainly not "clearly erroneous." [3]

### III.

The district court held that a finding that the cards were not copyrightable did not necessarily preempt the applicable state law regarding unfair competition. We agree. The Copyright Act declares only that state law rights which "are *equivalent* to any of the exclusive rights within the general scope of copyright" are preempted. 17 U.S.C. § 301 (1982) (emphasis added). The legislative history attempts to describe the forms of unfair competition which are "equivalent" to rights protected by federal copyright law and which are not:

> "Misappropriation" is not necessarily synonymous with copyright infringement ... For example, state law should have the flexibility to afford a remedy ... against a consistent pattern of unauthorized appropriation by a competitor of the facts ... constituting "hot" news, whether in the traditional mode of *International News Service v. Associated Press*, 248 U.S. 215 [39 S.Ct. 68, 63 L.Ed. 211] (1918), or in the newer form of data

updates from scientific, business or financial data bases.

H.R.Rep. No. 94–1476, 94th Cong., 2d Sess., 132 *reprinted in* 1976 U.S.Code Cong. & Ad.News 5659, 5748.[4] The New York Court of Appeals has expressly acknowledged that the Copyright Act preempts some state misappropriation claims. *See Editorial Photocolor Archives, Inc. v. Granger Collection*, 61 N.Y.2d 517, 523, 474 N.Y.S.2d 964, 463 N.E.2d 365 (1984). *Accord Oboler v. Goldin*, 714 F.2d 211, 213 (2d Cir.1983).

We are not persuaded by FII's argument that misappropriation is not "equivalent" to the exclusive rights provided by the Copyright Act. We have held that "state law claims that rely on the misappropriation branch of unfair competition are preempted." *Warner Bros., Inc. v. American Broadcasting Companies, Inc.*, 720 F.2d 231, 247 (2d Cir.1983).

■ Nor do we believe that a possible exception to the general rule of preemption in the misappropriation area—for claims involving "any form of commercial immorality," 1 Nimmer on Copyright, § 1.01[B]1, at 1–20 to 1–21 (1986), quoting *Metropolitan Opera Ass'n v. Wagner-Nichols Recorder Corp.*, 199 Misc. 786, 101 N.Y.S.2d 483, *aff'd*, 279 App.Div. 632, 107 N.Y.S.2d 795 (1951)—should be applied here. We believe that no such exception exists and reject its use here. Whether or not reproduction of another's work is "immoral" depends on whether such use of the work is wrongful. If, for example, the work is in the public domain, then its use would not be wrongful. Likewise, if, as here, the work is unprotected by federal law because of lack of originality, then its use is neither unfair nor unjustified.

---

**2.** FII concedes that Moody's did not copy from the FII annual volume, so we are not required to decide whether that work was copyrightable.

**3.** Judge Newman suggested hypothetically in his concurrence in *Financial Information I, supra*, 751 F.2d at 511, that the cards might be copyrightable as a series, but not as individual items. The district court rejected this theory, because there was no coordination or relationship be-

tween the cards. This conclusion was also fully supported by the record.

**4.** We need not explore the suggestion, noted in the House of Representative's report, that the use of information from "data bases" might subject the user to misappropriation claims, as the material in question here was obtained through conventional channels.

Second, FII attempts to characterize its claim here as one of "misappropriation" of "hot" news, under *International News Service v. Associated Press*, 248 U.S. 215, 39 S.Ct. 68, 63 L.Ed. 211 (1918), a branch of the unfair competition doctrine not preempted by the Copyright Act according to the House Report. In *International News Service*, one wire service tapped the lines of another and printed the fruits of this effort at the same time the originator of the news reports distributed them to its subscribers. The Supreme Court's remedy was to force the misappropriator to cease publishing the "hot" news until after the originator could distribute it. *See also Bond Buyer v. Dealer's Digest Publishing Co.*, 25 A.D.2d 158, 267 N.Y.S.2d 944 (1st Dept.1966) (one publisher of municipal bond news sheet sold teletype news to its subscribers before it published the material more widely; court enjoined second publisher from using that news in order to publish simultaneously with the first publisher).

 FII proved neither the quantity of copying nor the immediacy of distribution necessary to sustain a "hot" news claim. Because of lead times, to the extent that Moody's did copy from FII, the information it published would have been at least ten days old. The "hot" news doctrine is concerned with the copying and publication of information gathered by another before he has been able to utilize his competitive edge. *See, e.g., International News Service, supra; Bond Buyer, supra.* We hold that FII failed to prove such a claim here.

Finally, FII contends that its Daily Bond Cards are not "work[s]" of authorship" within 17 U.S.C. § 301(a) and, as such, claims based on misuse of the cards are not preempted. We disagree. As the House Report noted:

> As long as the work fits within one of the general subject matter categories of sections 102 and 103, the bill prevents the States from protecting it even if it fails to achieve Federal statutory copyright because it is too minimal or lacking in originality to qualify, or because it has fallen into the public domain.

H.R.Rep. No. 1476, 94th Cong., 2d Sess., 131 *reprinted in* 1976 U.S.Code Cong. & Ad.News, 5659, 5747. In rejecting copyright and unfair competition claims by a toy manufacturer in *Durham Industries, Inc. v. Tomy Corp.*, 630 F.2d 905, 919 n. 15 (2d Cir.1980), we held that even though the toys in question were not "work[s] of authorship" under 17 U.S.C. § 301(a), the state law claims were still preempted. That the toys "lack[ed] sufficient originality to qualify for protection under the Copyright Act," *id.*, required rejection of the pendent state claim; our similar finding on originality here compels the same disposition.

### IV.

The judgment of the district court is affirmed.