The NATIONAL BASKETBALL ASSOCI-
ATION and NBA Properties, Inc., Plain-
tiff–Counter–Defendant–Appellee–
Cross–Appellant,

v.

MOTOROLA, INC. doing business as
SportsTrax, Defendant–Counter–Claim-
ant–Appellant–Cross–Appellee,

Sports Team Analysis and Tracking Sys-
tems, Inc. doing business as Stats, Inc.,
Defendant–Appellant–Cross–Appellee.

Nos. 822, 824, Dockets 96–7975, 96–7983
(CON) and 96–9123 (XAP).

United States Court of Appeals,
Second Circuit.

Argued Oct. 21, 1996.

Decided Jan. 30, 1997.

Jeffrey A. Mishkin, The National Basketball Association and NBA Properties, Inc., New York City (Kathryn L. Barrett, Richard W. Buchanan, of counsel; Roger L. Zissu, Mark D. Engelmann, Raphael Winick, Weiss Dawid Fross Zelnick & Lehrman, of counsel), for Plaintiff–Counter–Defendant–Appellee–Cross–Appellant.

Herbert F. Schwartz, Fish & Neave, New York City (Patricia A. Martone, Vincent N. Palladino, of counsel; Roger H. Dusberger, Motorola, Inc., of counsel), for Defendant–Counter–Claimant–Appellant–Cross–Appellee.

Andrew L. Deutsch, Piper & Marbury, New York City (Edward F. Maluf, of counsel; Paul M. Levy, Alan D. Leib, Deutsch Levy & Engel Chartered, Chicago, IL, of counsel), for Defendant–Appellant–Cross–Appellee.

Bruce P. Keller, Debevoise & Plimpton, New York City (Lorin L. Reisner, of counsel), for Amici Curiae National Football League, Office of the Commissioner of Baseball and National Hockey League.

Floyd Abrams, Cahill Gordon & Reindel, New York City, for Amicus Curiae Interactive Services Association.

George Freeman, The New York Times Company, New York City, for Amicus Curiae The New York Times Company.

Susan E. Weiner, National Broadcasting Company, Inc., New York City (Michael K. Kellogg, Austin C. Schlick, Kellogg, Huber, Hansen, Todd & Evans, Washington, DC, of counsel), for Amicus Curiae National Broadcasting Company, Inc.

Lee A. Freeman, Jr., Freeman, Freeman & Salzman, Chicago, IL (Jerrold E. Salzman, Chris C. Gair, of counsel), for Amicus Curiae Chicago Mercantile Exchange.

Before: VAN GRAAFEILAND, WINTER, and ALTIMARI, Circuit Judges.

WINTER, Circuit Judge:

Motorola, Inc. and Sports Team Analysis and Tracking Systems ("STATS") appeal from a permanent injunction entered by Judge Preska. The injunction concerns a handheld pager sold by Motorola and marketed under the name "SportsTrax," which displays updated information of professional basketball games in progress. The injunction prohibits appellants, absent authorization from the National Basketball Association and NBA Properties, Inc. (collectively the "NBA"), from transmitting scores or other data about NBA games in progress via the pagers, STATS's site on America On–Line's computer dial-up service, or "any equivalent means."

The crux of the dispute concerns the extent to which a state law "hot-news" misappropriation claim based on *International News Service v. Associated Press*, 248 U.S. 215, 39 S.Ct. 68, 63 L.Ed. 211 (1918) ("*INS*"), survives preemption by the federal Copyright Act and whether the NBA's claim fits within the surviving *INS*-type claims. We hold that a narrow "hot-news" exception does survive preemption. However, we also hold that appellants' transmission of "real-time" NBA game scores and information tabulated from television and radio broadcasts of games in progress does not constitute a misappropriation of "hot news" that is the property of the NBA.

The NBA cross-appeals from the dismissal of its Lanham Act claim. We hold that any misstatements by Motorola in advertising its pager were not material and affirm.

## I. BACKGROUND

The facts are largely undisputed. Motorola manufactures and markets the SportsTrax paging device while STATS supplies the game information that is transmitted to the pagers. The product became available to the public in January 1996, at a retail price of about $200. SportsTrax's pager has an inch-and-a-half by inch-and-a-half screen and operates in four basic modes: "current," "statistics," "final scores" and "demonstration." It is the "current" mode that gives rise to the present dispute.[1] In that mode, SportsTrax

1. The other three SportsTrax modes involve information that is far less contemporaneous than that provided in the "current" mode. In the "statistics" mode, the SportsTrax pager displays a variety of player and team statistics, such as field goal shooting percentages and top scorers. However, these are calculated only at half-time and when the game is over. In the "final scores" mode, the unit displays final scores from the previous day's games. In the "demonstration" mode, the unit merely simulates information shown during a hypothetical NBA game. The core issue in the instant matter is the dissemination of continuously-updated real-time NBA game information in the "current" mode. Because we conclude that the dissemination of such real-time information is lawful, the other modes need no further description or discussion.

displays the following information on NBA games in progress: (i) the teams playing; (ii) score changes; (iii) the team in possession of the ball; (iv) whether the team is in the free-throw bonus; (v) the quarter of the game; and (vi) time remaining in the quarter. The information is updated every two to three minutes, with more frequent updates near the end of the first half and the end of the game. There is a lag of approximately two or three minutes between events in the game itself and when the information appears on the pager screen.

SportsTrax's operation relies on a "data feed" supplied by STATS reporters who watch the games on television or listen to them on the radio. The reporters key into a personal computer changes in the score and other information such as successful and missed shots, fouls, and clock updates. The information is relayed by modem to STATS's host computer, which compiles, analyzes, and formats the data for retransmission. The information is then sent to a common carrier, which then sends it via satellite to various local FM radio networks that in turn emit the signal received by the individual SportsTrax pagers.

Although the NBA's complaint concerned only the SportsTrax device, the NBA offered evidence at trial concerning STATS's America On–Line ("AOL") site. Starting in January, 1996, users who accessed STATS's AOL site, typically via a modem attached to a home computer, were provided with slightly more comprehensive and detailed real-time game information than is displayed on a SportsTrax pager. On the AOL site, game scores are updated every 15 seconds to a minute, and the player and team statistics are updated each minute. The district court's original decision and judgment, *National Basketball Ass'n v. Sports Team Analysis and Tracking Sys. Inc.*, 931 F.Supp. 1124 (S.D.N.Y.1996), did not address the AOL site, because "NBA's complaint and the evidence proffered at trial were devoted largely to SportsTrax." *National Basketball Ass'n v. Sports Team Analysis and Tracking*

*Sys. Inc.*, 939 F.Supp. 1071, 1074 n. 1 (S.D.N.Y.1996). Upon motion by the NBA, however, the district court amended its decision and judgment and enjoined use of the real-time game information on STATS's AOL site. *Id.* at 1075 n. 1. Because the record on appeal, the briefs of the parties, and oral argument primarily addressed the SportsTrax device, we similarly focus on that product. However, we regard the legal issues as identical with respect to both products, and our holding applies equally to SportsTrax and STATS's AOL site.

The NBA's complaint asserted six claims for relief: (i) state law unfair competition by misappropriation; (ii) false advertising under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); (iii) false representation of origin under Section 43(a) of the Lanham Act; (iv) state and common law unfair competition by false advertising and false designation of origin; (v) federal copyright infringement; and (vi) unlawful interception of communications under the Communications Act of 1934, 47 U.S.C. § 605. Motorola counterclaimed, alleging that the NBA unlawfully interfered with Motorola's contractual relations with four individual NBA teams that had agreed to sponsor and advertise SportsTrax.

The district court dismissed all of the NBA's claims except the first—misappropriation under New York law. The court also dismissed Motorola's counterclaim. Finding Motorola and STATS liable for misappropriation, Judge Preska entered the permanent injunction,[2] reserved the calculation of damages for subsequent proceedings, and stayed execution of the injunction pending appeal. Motorola and STATS appeal from the injunction, while NBA cross-appeals from the district court's dismissal of its Lanham Act false-advertising claim. The issues before us, therefore, are the state law misappropriation and Lanham Act claims.

## II. THE STATE LAW MISAPPROPRIATION CLAIM

### A. *Summary of Ruling*

Because our disposition of the state law misappropriation claim rests in large part on

---

**2.** The NBA moved initially for a preliminary injunction and a hearing was held on that motion. Subsequently, the parties agreed to consolidate the hearing into a trial on the merits, submitting supplemental briefing and attending an additional oral argument.

preemption by the Copyright Act, our discussion necessarily goes beyond the elements of a misappropriation claim under New York law, and a summary of our ruling here will perhaps render that discussion—or at least the need for it—more understandable.

The issues before us are ones that have arisen in various forms over the course of this century as technology has steadily increased the speed and quantity of information transmission. Today, individuals at home, at work, or elsewhere, can use a computer, pager, or other device to obtain highly selective kinds of information virtually at will. *International News Service v. Associated Press*, 248 U.S. 215, 39 S.Ct. 68, 63 L.Ed. 211 (1918) ("*INS* ") was one of the first cases to address the issues raised by these technological advances, although the technology involved in that case was primitive by contemporary standards. *INS* involved two wire services, the Associated Press ("AP") and International News Service ("INS"), that transmitted newsstories by wire to member newspapers. *Id.* INS would lift factual stories from AP bulletins and send them by wire to INS papers. *Id.* at 231, 39 S.Ct. at 69–70. INS would also take factual stories from east coast AP papers and wire them to INS papers on the west coast that had yet to publish because of time differentials. *Id.* at 238, 39 S.Ct. at 72. The Supreme Court held that INS's conduct was a common-law misappropriation of AP's property. *Id.* at 242, 39 S.Ct. at 73–74.

With the advance of technology, radio stations began "live" broadcasts of events such as baseball games and operas, and various entrepreneurs began to use the transmissions of others in one way or another for their own profit. In response, New York courts created a body of misappropriation law, loosely based on *INS*, that sought to apply ethical standards to the use by one party of another's transmissions of events.

Federal copyright law played little active role in this area until 1976. Before then, it appears to have been the general understanding—there being no caselaw of consequence—that live events such as baseball games were not copyrightable. Moreover, doubt existed even as to whether a recorded broadcast or videotape of such an event was copyrightable. In 1976, however, Congress passed legislation expressly affording copyright protection to simultaneously-recorded broadcasts of live performances such as sports events. *See* 17 U.S.C. § 101. Such protection was not extended to the underlying events.

The 1976 amendments also contained provisions preempting state law claims that enforced rights "equivalent" to exclusive copyright protections when the work to which the state claim was being applied fell within the area of copyright protection. *See* 17 U.S.C. § 301. Based on legislative history of the 1976 amendments, it is generally agreed that a "hot-news" *INS*-like claim survives preemption. H.R. No. 94–1476 at 132 (1976), *reprinted in* 1976 U.S.C.C.A.N. 5659, 5748. However, much of New York misappropriation law after *INS* goes well beyond "hot-news" claims and is preempted.

█ We hold that the surviving "hot-news" *INS*-like claim is limited to cases where: (i) a plaintiff generates or gathers information at a cost; (ii) the information is time-sensitive; (iii) a defendant's use of the information constitutes free riding on the plaintiff's efforts; (iv) the defendant is in direct competition with a product or service offered by the plaintiffs; and (v) the ability of other parties to free-ride on the efforts of the plaintiff or others would so reduce the incentive to produce the product or service that its existence or quality would be substantially threatened. We conclude that SportsTrax does not meet that test.

B. *Copyrights in Events or Broadcasts of Events*

The NBA asserted copyright infringement claims with regard both to the underlying games and to their broadcasts. The district court dismissed these claims, and the NBA does not appeal from their dismissal. Nevertheless, discussion of the infringement claims is necessary to provide the framework for analyzing the viability of the NBA's state law misappropriation claim in light of the Copyright Act's preemptive effect.

## 1. Infringement of a Copyright in the Underlying Games

In our view, the underlying basketball games do not fall within the subject matter of federal copyright protection because they do not constitute "original works of authorship" under 17 U.S.C. § 102(a). Section 102(a) lists eight categories of "works of authorship" covered by the act, including such categories as "literary works," "musical works," and "dramatic works." [3] The list does not include athletic events, and, although the list is concededly non-exclusive, such events are neither similar nor analogous to any of the listed categories.

Sports events are not "authored" in any common sense of the word. There is, of course, at least at the professional level, considerable preparation for a game. However, the preparation is as much an expression of hope or faith as a determination of what will actually happen. Unlike movies, plays, television programs, or operas, athletic events are competitive and have no underlying script. Preparation may even cause mistakes to succeed, like the broken play in football that gains yardage because the opposition could not expect it. Athletic events may also result in wholly unanticipated occurrences, the most notable recent event being in a championship baseball game in which interference with a fly ball caused an umpire to signal erroneously a home run.

What "authorship" there is in a sports event, moreover, must be open to copying by competitors if fans are to be attracted. If the inventor of the T-formation in football had been able to copyright it, the sport might have come to an end instead of prospering. Even where athletic preparation most resembles authorship—figure skating, gymnastics, and, some would uncharitably say, professional wrestling—a performer who conceives and executes a particularly graceful and difficult—or, in the case of wrestling, seemingly painful—acrobatic feat cannot copyright it without impairing the underlying competition in the future. A claim of being the only athlete to perform a feat doesn't mean much if no one else is allowed to try.

For many of these reasons, *Nimmer on Copyright* concludes that the "[f]ar more reasonable" position is that athletic events are not copyrightable. 1 M. Nimmer & D. Nimmer, *Nimmer on Copyright* § 2.09[F] at 2–170.1 (1996). *Nimmer* notes that, among other problems, the number of joint copyright owners would arguably include the league, the teams, the athletes, umpires, stadium workers and even fans, who all contribute to the "work."

Concededly, caselaw is scarce on the issue of whether organized events themselves are copyrightable, but what there is indicates that they are not. *See Production Contractors, Inc. v. WGN Continental Broadcasting Co.*, 622 F.Supp. 1500 (N.D.Ill.1985) (Christmas parade is not a work of authorship entitled to copyright protection). In claiming a copyright in the underlying games, the NBA relied in part on a footnote in *Baltimore Orioles, Inc. v. Major League Baseball Players Assn.*, 805 F.2d 663, 669 n. 7 (7th Cir. 1986), *cert. denied*, 480 U.S. 941, 107 S.Ct. 1593, 94 L.Ed.2d 782 (1987), which stated that the "[p]layers' performances" contain the "modest creativity required for copyright ability." However, the court went on to state, "Moreover, even if the [p]layers' performances were not sufficiently creative, the [p]layers agree that the cameramen and director contribute creative labor to the telecasts." *Id.* This last sentence indicates that the court was considering the copyright ability of telecasts—not the underlying games,

---

**3.** The text of Section 102(a) reads:

§ 102. Subject matter of copyright: In general

(a) Copyright protection subsists, in accordance with this title, in original works of authorship fixed in any tangible medium of expression, now known or later developed, from which they can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device. Works of authorship include the following categories:

(1) literary works;
(2) musical works, including any accompanying words;
(3) dramatic works, including any accompanying music;
(4) pantomimes and choreographic works;
(6) motion pictures and other audiovisual works;
(7) sound recordings; and
(8) architectural works.

which obviously can be played without cameras.

We believe that the lack of caselaw is attributable to a general understanding that athletic events were, and are, uncopyrightable. Indeed, prior to 1976, there was even doubt that broadcasts describing or depicting such events, which have a far stronger case for copyrightability than the events themselves, were entitled to copyright protection. Indeed, as described in the next subsection of this opinion, Congress found it necessary to extend such protection to recorded broadcasts of live events. The fact that Congress did not extend such protection to the events themselves confirms our view that the district court correctly held that appellants were not infringing a copyright in the NBA games.

### 2. *Infringement of a Copyright in the Broadcasts of NBA Games*

As noted, recorded broadcasts of NBA games—as opposed to the games themselves—are now entitled to copyright protection. The Copyright Act was amended in 1976 specifically to insure that simultaneously-recorded transmissions of live performances and sporting events would meet the Act's requirement that the original work of authorship be "fixed in any tangible medium of expression." 17 U.S.C. § 102(a). Accordingly, Section 101 of the Act, containing definitions, was amended to read:

A work consisting of sounds, images, or both, that are being transmitted, is "fixed" for purposes of this title if a fixation of the work is being made simultaneously with its transmission.

17 U.S.C. § 101. Congress specifically had sporting events in mind:

[T]he bill seeks to resolve, through the definition of "fixation" in section 101, the status of live broadcasts—sports, news coverage, live performances of music, etc.—that are reaching the public in unfixed form but that are simultaneously being recorded.

H.R. No. 94–1476 at 52, *reprinted in* 1976 U.S.C.C.A.N. at 5665. The House Report also makes clear that it is the broadcast, not the underlying game, that is the subject of copyright protection. In explaining how game broadcasts meet the Act's requirement that the subject matter be an "original work[ ] of authorship," 17 U.S.C. § 102(a), the House Report stated:

When a football game is being covered by four television cameras, with a director guiding the activities of the four cameramen and choosing which of their electronic images are sent out to the public and in what order, there is little doubt that what the cameramen and the director are doing constitutes "authorship."

H.R. No. 94–1476 at 52, *reprinted in* 1976 U.S.C.C.A.N. at 5665.

■ Although the broadcasts are protected under copyright law, the district court correctly held that Motorola and STATS did not infringe NBA's copyright because they reproduced only facts from the broadcasts, not the expression or description of the game that constitutes the broadcast. The "fact/expression dichotomy" is a bedrock principle of copyright law that "limits severely the scope of protection in fact-based works." *Feist Publications, Inc. v. Rural Tel. Service Co.,* 499 U.S. 340, 350, 111 S.Ct. 1282, 1290, 113 L.Ed.2d 358 (1991). " 'No author may copyright facts or ideas. The copyright is limited to those aspects of the work—termed 'expression'—that display the stamp of the author's originality.' " *Id.* (quoting *Harper & Row, Publishers, Inc. v. Nation Enter.,* 471 U.S. 539, 547, 105 S.Ct. 2218, 2224, 85 L.Ed.2d 588 (1985)).

We agree with the district court that the "[d]efendants provide purely factual information which any patron of an NBA game could acquire from the arena without any involvement from the director, cameramen, or others who contribute to the originality of a broadcast." 939 F.Supp. at 1094. Because the SportsTrax device and AOL site reproduce only factual information culled from the broadcasts and none of the copyrightable expression of the games, appellants did not infringe the copyright of the broadcasts.

### C. *The State–Law Misappropriation Claim*

The district court's injunction was based on its conclusion that, under New York law,

defendants had unlawfully misappropriated the NBA's property rights in its games. The district court reached this conclusion by holding: (i) that the NBA's misappropriation claim relating to the underlying games· was not preempted· by Section 301 of the Copyright Act; and (ii) that, under New York common law, defendants had engaged in unlawful misappropriation. *Id.* at 1094–1107. We disagree.

### 1. Preemption Under the Copyright Act

#### a) Summary

When Congress amended the Copyright Act in 1976, it provided for the preemption of state law claims that are interrelated with copyright claims in certain ways. Under 17 U.S.C. § 301, a state law claim is preempted when: (i) the state law claim seeks to vindicate "legal or equitable rights that are equivalent" to one of the bundle of exclusive rights already protected by copyright law under 17 U.S.C. § 106—styled the "general scope requirement"; and (ii) the particular work to which the state law claim is being applied falls within the type of works protected by the Copyright Act under Sections 102 and 103—styled the "subject matter requirement." [4]

■ The district court concluded that the NBA's misappropriation claim was not preempted because, with respect to the underlying games, as opposed to the broadcasts, the subject matter requirement was not met. 939 F.Supp. at 1097. The court dubbed as "partial preemption" its separate analysis of misappropriation claims relating to the underlying games and misappropriation claims relating to broadcasts of those games. *Id.* at 1098, n. 24. The district court then relied on a series of older New York misappropriation cases involving radio broadcasts that considerably broadened *INS.* We hold that where the challenged copying or misappropriation relates in part to the copyrighted broadcasts of the games, the subject matter requirement is met as to both the broadcasts and the games. We therefore reject the partial preemption doctrine and its anomalous consequence that "it is possible for a plaintiff to assert claims both for infringement of its copyright in a broadcast and misappropriation of its rights in the underlying event." *Id.* We do find that a properly-narrowed *INS* "hot-news" misappropriation claim survives preemption because it fails the general scope requirement, but that the broader theory of the radio broadcast cases relied upon by the district court were ·preempted when Congress extended copyright protection to simultaneously-recorded broadcasts.

#### b) "Partial Preemption" and the Subject Matter Requirement

■ The subject matter requirement is met when the work of authorship being copied or misappropriated "fall[s] within the ambit of copyright protection." *Harper & Row, Publishers, Inc. v. Nation Enter.,* 723 F.2d 195, 200 (1983), *rev'd on other grounds,* 471 U.S. 539, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985). We believe that the subject matter requirement is met in the instant matter and that the concept of "partial ·preemption" is not consistent with Section 301 of the Copyright Act. Although game broadcasts are copyrightable while the underlying games are not, the Copyright Act should not be

---

4. The relevant portions of the statute, 17 U.S.C. § 301, read:

§ 301. Preemption with respect to other laws
(a) On and after January 1, 1978, all legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106 in works of authorship that are fixed in a tangible medium of expression and come within the subject matter of copyright as specified by sections 102 and 103, whether created before or after that date and whether published or unpublished, are governed exclusively by this title. Thereafter, no person is entitled to any such right or equivalent right in any such work under the common law or statutes of any State.
(b) Nothing in this title annuls or limits any rights or remedies under the common law or statutes of any State with respect to—
(1) subject matter that does not come within the subject matter of copyright as specified by sections 102 and 103, including works of authorship not fixed in any tangible medium of expression; or ...
(3) activities violating legal or equitable rights that are not equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106.

read to distinguish between the two when analyzing the preemption of a misappropriation claim based on copying or taking from the copyrightable work. We believe that:

> [O]nce a performance is reduced to tangible form, there is no distinction between the performance and the recording of the performance for the purposes of preemption under § 301(a). Thus, if a baseball game were not broadcast or were telecast without being recorded, the Players' performances similarly would not be fixed in tangible form and their rights of publicity would not be subject to preemption. By virtue of being videotaped, however, the Players' performances are fixed in tangible form, and any rights of publicity in their performances that are equivalent to the rights contained in the copyright of the telecast are preempted.

*Baltimore Orioles,* 805 F.2d at 675 (citation omitted).

■ Copyrightable material often contains uncopyrightable elements within it, but Section 301 preemption bars state law misappropriation claims with respect to uncopyrightable as well as copyrightable elements. In *Harper & Row,* for example, we held that state law claims based on the copying of excerpts from President Ford's memoirs were preempted even with respect to information that was purely factual and not copyrightable. We stated:

> [T]he [Copyright] Act clearly embraces "works of authorship," including "literary works," as within its subject matter. The fact that portions of the Ford memoirs may consist of uncopyrightable material ... does not take the work as a whole outside the subject matter protected by the Act. Were this not so, states would be free to expand the perimeters of copyright protection to their own liking, on the theory that preemption would be no bar to state protection of material not meeting federal statutory standards.

723 F.2d at 200 (citation omitted). The legislative history supports this understanding of Section 301(a)'s subject matter requirement. The House Report stated:

> As long as a work fits within one of the general subject matter categories of sections 102 and 103, the bill prevents the States from protecting it even if it fails to achieve Federal statutory copyright because it is too minimal or lacking in originality to qualify, or because it has fallen into the public domain.

H.R. No. 94–1476 at 131, *reprinted in* 1976 U.S.C.C.A.N. at 5747. *See also Baltimore Orioles,* 805 F.2d at 676 (citing excerpts of House Report 94–1476).

Adoption of a partial preemption doctrine—preemption of claims based on misappropriation of broadcasts but no preemption of claims based on misappropriation of underlying facts—would expand significantly the reach of state law claims and render the preemption intended by Congress unworkable. It is often difficult or impossible to separate the fixed copyrightable work from the underlying uncopyrightable events or facts. Moreover, Congress, in extending copyright protection only to the broadcasts and not to the underlying events, intended that the latter be in the public domain. Partial preemption turns that intent on its head by allowing state law to vest exclusive rights in material that Congress intended to be in the public domain and to make unlawful conduct that Congress intended to allow. This concern was recently expressed in *ProCD, Inc. v. Zeidenberg,* 86 F.3d 1447 (7th Cir. 1996), a case in which the defendants reproduced non-copyrightable facts (telephone listings) from plaintiffs' copyrighted software. In discussing preemption under Section 301(a), Judge Easterbrook held that the subject matter requirement was met and noted:

> ProCD's software and data are "fixed in a tangible medium of expression", and the district judge held that they are "within the subject matter of copyright". The latter conclusion is plainly right for the copyrighted application program, and the judge thought that the data likewise are "within the subject matter of copyright" even if, after *Feist,* they are not sufficiently original to be copyrighted. [*ProCD, Inc. v. Zeidenberg,*] 908 F.Supp. [640] at 656–57 [(W.D.Wis. 1996)]. *Baltimore Orioles, Inc. v. Major League Baseball Players Ass'n,* 805 F.2d 663, 676 (7th Cir.1986), supports that conclusion, with which commentators

agree.... One function of § 301(a) is to prevent states from giving special protection to works of authorship that Congress has decided should be in the public domain, which it can accomplish only if "subject matter of copyright" includes all works of a *type* covered by sections 102 and 103, even if federal law does not afford protection to them.

*ProCD*, 86 F.3d at 1453 (citation omitted). We agree with Judge Easterbrook and reject the separate analysis of the underlying games and broadcasts of those games for purposes of preemption.

c) The General Scope Requirement

■ Under the general scope requirement, Section 301 "preempts only those state law rights that 'may be abridged by an act which, in and of itself, would infringe one of the exclusive rights' provided by federal copyright law." *Computer Assoc. Int'l, Inc. v. Altai, Inc.*, 982 F.2d 693, 716 (2d Cir.1992) (quoting *Harper & Row*, 723 F.2d at 200). However, certain forms of commercial misappropriation otherwise within the general scope requirement will survive preemption if an "extra-element" test is met. As stated in *Altai:*

> But if an "extra element" is "required instead of or in addition to the acts of reproduction, performance, distribution or display, in order to constitute a state-created cause of action, then the right does not lie 'within the general scope of copyright,' and there is no preemption."

*Id.* (quoting 1 *Nimmer on Copyright* § 1.01[B] at 1–15).

*ProCD* was in part an application of the extra-element test. Having held the misappropriation claims to be preempted, Judge Easterbrook went on to hold that the plaintiffs could bring a state law contract claim. The court held that the defendants were bound by the software's shrink-wrap licenses as a matter of contract law and that the private contract rights were not preempted because they were not equivalent to the ex-

clusive rights granted by copyright law. In other words, the contract right claims were not preempted because the general scope requirement was not met. *ProCD*, 86 F.3d at 1455.

We turn, therefore, to the question of the extent to which a "hot-news" misappropriation claim based on *INS* involves extra elements and is not the equivalent of exclusive rights under a copyright. Courts are generally agreed that some form of such a claim survives preemption. *Financial Information, Inc. v. Moody's Investors Service, Inc.,* 808 F.2d 204, 208 (2d Cir.1986), *cert. denied,* 484 U.S. 820, 108 S.Ct. 79, 98 L.Ed.2d 42 (1987) (*"FII"*). This conclusion is based in part on the legislative history of the 1976 amendments. The House Report stated:

> "Misappropriation" is not necessarily synonymous with copyright infringement, and thus a cause of action labeled as "misappropriation" is not preempted if it is in fact based neither on a right within the general scope of copyright as specified by section 106 nor on a right equivalent thereto. For example, state law should have the flexibility to afford a remedy (under traditional principles of equity) against a consistent pattern of unauthorized appropriation by a competitor of the facts (i.e., not the literary expression) constituting "hot" news, whether in the traditional mold of *International News Service v. Associated Press,* 248 U.S. 215 [39 S.Ct. 68, 63 L.Ed. 211] (1918), or in the newer form of data updates from scientific, business, or financial data bases.

H.R. No. 94–1476 at 132, *reprinted in* 1976 U.S.C.C.A.N. at 5748 (footnote omitted),[5] *see also FII,* 808 F.2d at 209 (" 'misappropriation' of 'hot' news, under *International News Service,* [is] a branch of the unfair competition doctrine not preempted by the Copyright Act according to the House Report" (citation omitted)). The crucial question, therefore, is the *breadth* of the "hot-news" claim that survives preemption.

**5.** Although this passage implies that *INS* survives preemption because it fails the general scope requirement, *Nimmer* apparently takes the view adopted by the district court, namely that *INS* survives preemption because the subject matter requirement is not met. *Nimmer* § 1.01[B][2][b] at 1–44.2.

In *INS*, the plaintiff AP and defendant INS were "wire services" that sold news items to client newspapers. AP brought suit to prevent INS from selling facts and information lifted from AP sources to INS-affiliated newspapers. One method by which INS was able to use AP's news was to lift facts from AP news bulletins. *INS*, 248 U.S. at 231, 39 S.Ct. at 69–70. Another method was to sell facts taken from just-published east coast AP newspapers to west coast INS newspapers whose editions had yet to appear. *Id.* at 238, 39 S.Ct. at 72. The Supreme Court held (prior to *Erie R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938)), that INS's use of AP's information was unlawful under federal common law. It characterized INS's conduct as

amount[ing] to an unauthorized interference with the normal operation of complainant's legitimate business precisely at the point where the profit is to be reaped, in order to divert a material portion of the profit from those who have earned it to those who have not; with special advantage to defendant in the competition because of the fact that it is not burdened with any part of the expense of gathering the news.

*INS*, 248 U.S. at 240, 39 S.Ct. at 72–73.

The theory of the New York misappropriation cases relied upon by the district court is considerably broader than that of *INS*. For example, the district court quoted at length from *Metropolitan Opera Ass'n v. Wagner–Nichols Recorder Corp.*, 199 Misc. 786, 101 N.Y.S.2d 483 (N.Y.Sup.Ct.1950), *aff'd*, 279 A.D. 632, 107 N.Y.S.2d 795 (1st Dep't 1951). *Metropolitan Opera* described New York misappropriation law as standing for the "broader principle that property rights of commercial value are to be and will be protected from any form of commercial immorality"; that misappropriation law developed "to deal with business malpractices offensive to the ethics of [ ] society"; and that the doctrine is "broad and flexible." 939 F.Supp. at 1098–1110 (quoting *Metropolitan Opera*, 101 N.Y.S.2d at 492, 488–89).

However, we believe that *Metropolitan Opera*'s broad misappropriation doctrine based on amorphous concepts such as "commercial immorality" or society's "ethics" is preempted. Such concepts are virtually synonymous for wrongful copying and are in no meaningful fashion distinguishable from infringement of a copyright. The broad misappropriation doctrine relied upon by the district court is, therefore, the equivalent of exclusive rights in copyright law.

Indeed, we said as much in *FII*. That decision involved the copying of financial information by a rival financial reporting service and specifically repudiated the broad misappropriation doctrine of *Metropolitan Opera*. We explained:

We are not persuaded by FII's argument that misappropriation is not "equivalent" to the exclusive rights provided by the Copyright Act.... Nor do we believe that a possible exception to the general rule of preemption in the misappropriation area—for claims involving "any form of commercial immorality,"... quoting *Metropolitan Opera Ass'n v. Wagner–Nichols Recorder Corp.*, 199 Misc. 786, 101 N.Y.S.2d 483, ...—should be applied here. We believe that no such exception exists and reject its use here. Whether or not reproduction of another's work is "immoral" depends on whether such use of the work is wrongful. If, for example, the work is in the public domain, then its use would not be wrongful. Likewise, if, as here, the work is unprotected by federal law because of lack of originality, then its use is neither unfair nor unjustified.

*FII*, 808 F.2d at 208. In fact, *FII* only begrudgingly concedes that even narrow "hot news" *INS*-type claims survive preemption. *Id.* at 209.

Moreover, *Computer Associates Intern., Inc. v. Altai Inc.* indicated that the "extra element" test should not be applied so as to allow state claims to survive preemption easily. 982 F.2d at 717. "An action will not be saved from preemption by elements such as awareness or intent, which alter 'the action's scope but not its nature'.... Following this 'extra element' test, we have held that unfair competition and misappropriation claims grounded solely in the copying of a plaintiff's protected expression are preempted by section 301." *Id.* (citation omitted).

In light of cases such as *FII* and *Altai* that emphasize the narrowness of state misappropriation claims that survive preemption, most of the broadcast cases relied upon by the NBA are simply not good law. Those cases were decided at a time when simultaneously-recorded broadcasts were not protected under the Copyright Act and when the state law claims they fashioned were not subject to federal preemption. For example, *Metropolitan Opera*, 101 N.Y.S.2d 483, involved the unauthorized copying, marketing, and sale of opera radio broadcasts. As another example, in *Mutual Broadcasting System v. Muzak Corp.*, 177 Misc. 489, 30 N.Y.S.2d 419 (Sup. Ct.1941), the defendant simultaneously retransmitted the plaintiff's baseball radio broadcasts onto telephone lines. As discussed above, the 1976 amendments to the Copyright Act were specifically designed to afford copyright protection to simultaneously-recorded broadcasts, and *Metropolitan Opera* and *Muzak* could today be brought as copyright infringement cases. Moreover, we believe that they would *have* to be brought as copyright cases because the amendments affording broadcasts copyright protection also preempted the state law misappropriation claims under which they were decided.

Our conclusion, therefore, is that only a narrow "hot-news" misappropriation claim survives preemption for actions concerning material within the realm of copyright.[6] *See also 1 McCarthy on Trademarks and Unfair Competition* (4th ed. 1996), § 10:69, at 10–134 (discussing *National Exhibition Co. v. Fass*, 133 N.Y.S.2d 379 (Sup.Ct.1954), *Mu-*

*zak*, 30 N.Y.S.2d 419, and other cases relied upon by NBA that pre-date the 1976 amendment to the Copyright Act and concluding that after the amendment, "state misappropriation law would be unnecessary and would be preempted: protection is solely under federal copyright").[7]

In our view, the elements central to an *INS* claim are: (i) the plaintiff generates or collects information at some cost or expense, *see FII*, 808 F.2d at 206; *INS*, 248 U.S. at 240, 39 S.Ct. at 72–73; (ii) the value of the information is highly time-sensitive, *see FII*, 808 F.2d at 209; *INS*, 248 U.S. at 231, 39 S.Ct. at 69–70; *Restatement (Third) Unfair Competition*, § 38 cmt. c.; (iii) the defendant's use of the information constitutes free-riding on the plaintiff's costly efforts to generate or collect it, *see FII*, 808 F.2d at 207; *INS*, 248 U.S. at 239–40, 39 S.Ct. at 72–73; *Restatement* § 38 at cmt. c.; *McCarthy*, § 10:73 at 10–139; (iv) the defendant's use of the information is in direct competition with a product or service offered by the plaintiff, *FII*, 808 F.2d at 209, *INS*, 248 U.S. at 240, 39 S.Ct. at 72–73; (v) the ability of other parties to free-ride on the efforts of the plaintiff would so reduce the incentive to produce the product or service that its existence or quality would be substantially threatened, *FII*, 808 F.2d at 209; *Restatement*, § 38 at cmt. c.; *INS*, 248 U.S. at 241, 39 S.Ct. at 73 ("[INS's conduct] would render [AP's] publication profitless, or so little profitable as in effect to cut off the service by rendering the cost prohibitive in comparison with the re-

---

**6.** State law claims involving breach of fiduciary duties or trade-secret claims are not involved in this matter and are not addressed by this discussion. These claims are generally not preempted because they pass the "extra elements" test. *See Altai*, 982 F.2d at 717.

**7.** Quite apart from Copyright Act preemption, *INS* has long been regarded with skepticism by many courts and scholars and often confined strictly to its facts. In particular, Judge Learned Hand was notably hostile to a broad reading of the case. He wrote:

[W]e think that no more was covered than situations substantially similar to those then at bar. The difficulties of understanding it otherwise are insuperable. We are to suppose that the court meant to create a sort of common-law patent or copyright for reasons of justice.

Either would flagrantly conflict with the scheme which Congress has for more than a century devised to cover the subject-matter. *Cheney Bros. v. Doris Silk Corp.*, 35 F.2d 279, 280 (2d Cir.1929), *cert. denied*, 281 U.S. 728, 50 S.Ct. 245, 74 L.Ed. 1145 (1930). *See also Restatement (Third) of Unfair Competition* § 38 cmt. c (1995):

The facts of the INS decision are unusual and may serve, in part, to limit its rationale.... The limited extent to which the *INS* rationale has been incorporated into the common law of the states indicate that the decision is properly viewed as a response to unusual circumstances rather than as a statement of generally applicable principles of common law. Many subsequent decisions have expressly limited the INS case to its facts.

turn.") [8]

*INS* is not about ethics; it is about the protection of property rights in time-sensitive information so that the information will be made available to the public by profit seeking entrepreneurs. If services like AP were not assured of property rights in the news they pay to collect, they would cease to collect it. The ability of their competitors to appropriate their product at only nominal cost and thereby to disseminate a competing product at a lower price would destroy the incentive to collect news in the first place. The newspaper-reading public would suffer because no one would have an incentive to collect "hot news."

■ We therefore find the extra elements—those in addition to the elements of copyright infringement—that allow a "hot-news" claim to survive preemption are: (i) the time-sensitive value of factual information, (ii) the free-riding by a defendant, and (iii) the threat to the very existence of the product or service provided by the plaintiff.

### 2. The Legality of SportsTrax

■ We conclude that Motorola and STATS have not engaged in unlawful misappropriation under the "hot-news" test set out above. To be sure, some of the elements of a "hot-news" *INS* claim are met. The information transmitted to SportsTrax is not precisely contemporaneous, but it is nevertheless time-sensitive. Also, the NBA does provide, or will shortly do so, information like that available through SportsTrax. It now offers a service called "Gamestats" that provides official play-by-play game sheets and half-time and final box scores within each arena. It also provides such information to the media in each arena. In the future, the NBA plans to enhance Gamestats so that it will be networked between the various arenas and will support a pager product analogous to SportsTrax. SportsTrax will of course directly compete with an enhanced Gamestats.

However, there are critical elements missing in the NBA's attempt to assert a "hot-news" *INS*-type claim. As framed by the NBA, their claim compresses and confuses three different informational products. The first product is generating the information by playing the games; the second product is transmitting live, full descriptions of those games; and the third product is collecting and retransmitting strictly factual information about the games. The first and second products are the NBA's primary business: producing basketball games for live attendance and licensing copyrighted broadcasts of those games. The collection and retransmission of strictly factual material about the games is a different product: e.g., box-scores in newspapers, summaries of statistics on television sports news, and real-time facts to be transmitted to pagers. In our view, the NBA has failed to show any competitive effect whatsoever from SportsTrax on the first and second products and a lack of any free-riding by SportsTrax on the third.

With regard to the NBA's primary products—producing basketball games with live attendance and licensing copyrighted broadcasts of those games—there is no evidence

8. Some authorities have labeled this element as requiring direct competition between the defendant and the plaintiff in a primary market. "[I]n most of the small number of cases in which the misappropriation doctrine has been determinative, the defendant's appropriation, like that in *INS*, resulted in direct competition in the plaintiffs' primary market ... Appeals to the misappropriation doctrine are almost always rejected when the appropriation does not intrude upon the plaintiff's primary market.", *Restatement (Third) of Unfair Competition*, § 38 cmt. c, at 412–13; *see also National Football League v. Governor of State of Delaware*, 435 F.Supp. 1372 (D.Del.1977). In that case, the NFL sued Delaware over the state's lottery game which was based on NFL games. In dismissing the wrongful misappropriation claims, the court stated:

While courts have recognized that one has a right to one's own harvest, this proposition has not been construed to preclude others from profiting from demands for collateral services generated by the success of one's business venture.

*Id.* at 1378. The court also noted, "It is true that Delaware is thus making profits it would not make but for the existence of the NFL, but I find this difficult to distinguish from the multitude of charter bus companies who generate profit from servicing those of plaintiffs' fans who want to go to the stadium or, indeed, the sidewalk popcorn salesman who services the crowd as it surges towards the gate." *Id.*

that anyone regards SportsTrax or the AOL site as a substitute for attending NBA games or watching them on television. In fact, Motorola markets SportsTrax as being designed "for those times when you cannot be at the arena, watch the game on TV, or listen to the radio ..."

The NBA argues that the pager market is also relevant to a "hot-news" *INS*-type claim and that SportsTrax's future competition with Gamestats satisfies any missing element. We agree that there is a separate market for the real-time transmission of factual information to pagers or similar devices, such as STATS's AOL site. However, we disagree that SportsTrax is in any sense free-riding off Gamestats.

An indispensable element of an *INS* "hot-news" claim is free riding by a defendant on a plaintiff's product, enabling the defendant to produce a directly competitive product for less money because it has lower costs. SportsTrax is not such a product. The use of pagers to transmit real-time information about NBA games requires: (i) the collecting of facts about the games; (ii) the transmission of these facts on a network; (iii) the assembling of them by the particular service; and (iv) the transmission of them to pagers or an on-line computer site. Appellants are in no way free-riding on Gamestats. Motorola and STATS expend their own resources to collect purely factual information generated in NBA games to transmit to SportsTrax pagers. They have their own network and assemble and transmit data themselves.

9. It may well be that the NBA's product, when enhanced, will actually have a competitive edge because its Gamestats system will apparently be used for a number of in-stadium services as well as the pager market, resulting in a certain amount of cost sharing. Gamestats might also have a temporal advantage in collecting and transmitting official statistics. Whether this is so does not affect our disposition of this matter, although it does demonstrate the gulf between this case and *INS*, where the free-riding created the danger of no wire service being viable.

10. In view of our disposition of this matter, we need not address appellants' First Amendment and laches defenses.

11. The text of 15 U.S.C. § 1125(a)(1) reads in pertinent part:

To be sure, if appellants in the future were to collect facts from an enhanced Gamestats pager to retransmit them to SportsTrax pagers, that would constitute free-riding and might well cause Gamestats to be unprofitable because it had to bear costs to collect facts that SportsTrax did not. If the appropriation of facts from one pager to another pager service were allowed, transmission of current information on NBA games to pagers or similar devices would be substantially deterred because any potential transmitter would know that the first entrant would quickly encounter a lower cost competitor free-riding on the originator's transmissions.[9]

However, that is not the case in the instant matter. SportsTrax and Gamestats are each bearing their own costs of collecting factual information on NBA games, and, if one produces a product that is cheaper or otherwise superior to the other, that producer will prevail in the marketplace. This is obviously not the situation against which *INS* was intended to prevent: the potential lack of any such product or service because of the anticipation of free-riding.

For the foregoing reasons, the NBA has not shown any damage to any of its products based on free-riding by Motorola and STATS, and the NBA's misappropriation claim based on New York law is preempted.[10]

### III. THE NBA'S CROSS–APPEAL

The NBA cross-appeals from the district court's dismissal of its false advertising claim under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).[11] This claim was

§ 1125. False designations of origin, false descriptions, and dilution forbidden
(a) Civil action; any person
(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—
(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or
(B) in commercial advertising or promotion, misrepresents the nature, characteristics,

based on a January 1996 Motorola press release stating that SportsTrax provides "updated game information direct from each arena" which "originate[s] from the press table in each arena" and on a statement appearing on the spine of the retail box and on the retail display stand that SportsTrax provides "game updates from the arena."

NBA argues that because STATS reporters collect their information from television and radio broadcasts, the information is not "direct from each arena" or even "from the arena." Motorola responds that the statement about information coming from the press table was an isolated remark occurring only in that press release. It also claims that the assertion that the game updates come "from the arena" is not literally false, presumably because the factual information does originate in the arena.

 To establish a false advertising claim under Section 43(a), the plaintiff must demonstrate that the statement in the challenged advertisement is false. "Falsity may be established by proving that (1) the advertising is literally false as a factual matter, or (2) although the advertisement is literally true, it is likely to deceive or confuse customers." *Lipton v. Nature Co.*, 71 F.3d 464, 474 (2d Cir.1995). However, in addition to proving falsity, the plaintiff must also show that the defendants "misrepresented an 'inherent quality or characteristic'" of the product. *National Assoc. of Pharmaceutical Mfrs. v. Ayerst Lab.*, 850 F.2d 904, 917 (2d Cir.1988) (quoting *Vidal Sassoon, Inc. v. Bristol–Myers Co.*, 661 F.2d 272, 278 (2d Cir.1981)). This requirement is essentially one of materiality, a term explicitly used in other circuits. *See American Tel. & Tel. Co. v. Winback and Conserve Program, Inc.*, 42 F.3d 1421, 1428 n. 9 (3d Cir.1994) (plaintiff alleging false advertising must prove "that the deception is material in that it is likely to influence purchasing decisions") (citations and internal quotation marks omitted), *cert. denied,* ── U.S. ──, 115 S.Ct. 1838, 131 L.Ed.2d 757 (1995); *ALPO Petfoods, Inc. v. Ralston Purina Co.*, 913 F.2d 958, 964 (D.C.Cir.1990)

(false or misleading ads must be "material in their effects on buying decisions"); *Taquino v. Teledyne Monarch Rubber*, 893 F.2d 1488, 1500 (5th Cir.1990) (deception must be "material, in that it is likely to influence the purchasing decision"); *see also* 3 *McCarthy on Trademarks* § 27:35 at 27–54 (there must be "some showing that the defendant's misrepresentation was 'material' in the sense that it would have some effect on consumers' purchasing decisions.").

The district court found, "[a]fter viewing the complained-of statements in this action in their context," that "[t]he statements as to the particular origin of game updates constitute nothing more than minutiae about SportsTrax." 939 F.Supp. at 1110. We agree with the district court that the statements in question are not material in the present factual context. The inaccuracy in the statements would not influence consumers at the present time, whose interest in obtaining updated game scores on pagers is served only by SportsTrax. Whether the data is taken from broadcasts instead of being observed first-hand is, therefore, simply irrelevant. However, we note that if the NBA were in the future to market a rival pager with a direct datafeed from the arenas—perhaps with quicker updates than SportsTrax and official statistics—then Motorola's statements regarding source might well be materially misleading. On the present facts, however, the complained-of statements are not material and do not misrepresent an inherent quality or characteristic of the product.

## IV. CONCLUSION

We vacate the injunction entered by the district court and order that the NBA's claim for misappropriation be dismissed. We affirm the district court's dismissal of the NBA's claim for false advertising under Section 43(a) of the Lanham Act.

qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.