*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@appellate.courts.state.ak.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| ALASKASLAND.COM, LLC, | ) | |
| | ) | Supreme Court No. S-15270 |
| Appellant, | ) | |
| | ) | Superior Court No. 3AN-12-04799 CI |
| v. | ) | |
| | ) | O P I N I O N |
| KEVIN CROSS d/b/a CROSS & | ) | |
| ASSOCIATES and SALMAN GROUP; | ) | No. 7057 - September 25, 2015 |
| WILLIAM W. JACQUES; MATT | ) | |
| DIMMICK; and KELLER WILLIAMS | ) | |
| REALTY – ALASKA GROUP, | ) | |
| | ) | |
| Appellees. | ) | |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Frank A. Pfiffner, Judge.

Appearances: Brian J. Stibitz, Reeves Amodio LLC, Anchorage, for Appellant. Matthew W. Claman and James B. Stoetzer, Lane Powell LLC, Anchorage, for Appellees.

Before: Fabe, Chief Justice, Winfree, Stowers, Maassen, and Bolger, Justices.

WINFREE, Justice.

I.      INTRODUCTION

Using three photographs taken from a neighboring subdivision's marketing materials — including one portraying the subdivision's stylized entrance sign — a realtor

group listed adjacent property for sale on a multiple listing service website. The listing also contained a property appraisal stating that (1) based on plat-related information, existing legal access to the property might compromise the neighboring subdivision's gated community perimeter fencing, and (2) based on statements made to the appraiser by employees of the local electric association, the neighboring subdivision's electric service might be subject to legal issues. The subdivision's developer then sued the realtors for misappropriation of the photos, trade name infringement, and defamation. The superior court granted summary judgment to the realtors and awarded them enhanced attorney's fees; the developer appeals. Because there are no material factual disputes and the realtors are entitled to judgment as a matter of law, we affirm the superior court's grant of summary judgment (although in part on grounds not relied upon by the superior court). And because we cannot conclude that the superior court abused its discretion in awarding attorney's fees, we affirm that decision as well.

## II.     FACTS AND PROCEEDINGS

### A.     Facts

Alaskasland.com, LLC (Alaskasland) is the owner-developer of a gated subdivision located between the Parks Highway and the Susitna River. Asbury Moore is Alaskasland's general manager, and Duane Mathes is its real estate broker. Since 2008 Alaskasland has marketed its subdivided lots under the name "Susitna Shores," but the name was not registered. Alaskasland constructed a prominent concrete sign at the subdivision entrance featuring the Susitna Shores name and logo, and it has used the name and logo on its website and in printed marketing materials. Alaskasland estimates it spent almost 900 hours and approximately $160,000 on developing and distributing promotional materials for Susitna Shores. Of the subdivision's 37 lots, 15 had been sold by the time the superior court granted summary judgment in July 2013; the most recent sale was in May 2011.

In 2009 Bryan and Tara Goode inherited property (Goode property) from Florence Sawby. The Goode property is bounded on three sides by the Susitna Shores subdivision and on the fourth by the Susitna River. Alaskasland had been interested in purchasing the property and had unsuccessfully offered Sawby $45,000 for it in 2007.

Gregory Brooker appraised the Goode property and valued it at $150,000. His appraisal noted that "[t]he electric service in the [Susitna Shores] subdivision may be subject to legal issues due to the lack of [Matanuska Electric Association] participation in construction of the infrastructure." The appraisal also noted that "the [Goode property] has an undeniable access right that crosses the access to [the Susitna Shores] subdivision boat ramp — and that access could be developed and probably left open, thereby defeating the gated subdivision."

In August 2011 the Goodes listed their property for sale with realtor Kevin Cross, associated with Keller Williams Realty - Alaska Group (Keller Williams), for $146,000. Because the Goodes did not provide Cross any photographs of the property, his assistant located on the internet photographs that came from Alaskasland's website depicting: Susitna Shores' entrance sign with its stylized logo; Mt. McKinley; and Moore fishing with his family on a river. Mathes had taken the first two photographs himself and had obtained the third from Moore. The photographs were appended to the Goode property listing on the Alaska Multiple Listing Service (MLS) website. MLS maintains a comprehensive online database of real estate listings on both a realtor-only website, called the FlexMLS site, and a separate publicly accessible site. Brooker's appraisal also was appended to the Goode property listing on the FlexMLS website; it was never available on the publicly accessible MLS website.

In early November 2011 Mathes discovered that the Goode property was listed for sale and informed Moore. After viewing the MLS listing Moore determined that the three Alaskasland photographs were being used to market the Goode property,

-3-                                                                  **7057**

and Mathes promptly notified MLS that Cross was improperly using these photographs. Mathes then contacted Cross to express interest in purchasing the Goode property. Mathes asked Cross for a copy of the appraisal, which Cross immediately sent to him. Mathes apparently also viewed the appraisal through the FlexMLS site at various times. Mathes then conveyed to Cross an offer from Moore to purchase the Goode property for $95,000, which the Goodes promptly rejected.

In response to the information received from Mathes, MLS confirmed to Cross that the photographs appended to the Goode property listing "were taken from another licensee[']s listing and website" and that MLS was removing the photographs from the listing. In mid-December Cross notified Mathes that he had been informed the photographs were still viewable through other real estate listing sites due to a flaw in MLS's system, and that Cross had contacted the other sites to request that the photographs be removed immediately. Cross stated he was "assured that this is being taken care of," and Moore later confirmed he could not find the photographs on any other website after December 2011.

Because the Goodes had received only the one offer from Moore, they decided to cancel their listing in mid-December 2011. Shortly thereafter William Jacques, the Broker in Charge at Keller Williams, notified Cross that the appraisal remained a part of the cancelled listing on the FlexMLS site and that Moore and Mathes wanted it removed. Cross apparently was under the impression that cancelling the listing had removed the appraisal from the site. At some point Cross contacted MLS "to see what had to be done" to remove the appraisal. MLS removed the appraisal in early May 2013.

B.    Proceedings

In January 2012 Alaskasland filed suit against Cross, Jacques, Keller Williams and another Keller Williams employee, and the Goodes (collectively the

Realtors).  The complaint, as later amended, alleged several common law causes of action:  (1) "injunction" for harm from posting the photographs and appraisal; (2) misappropriation of Alaskasland's advertising materials, specifically the photographs from Alaskasland's website; (3) trademark and trade name infringement through use of the Susitna Shores sign photograph; (4) publication of false and defamatory information by posting the Brooker appraisal; (5) interference with existing and prospective business relationships; (6) conspiracy to defraud by false representations; and (7) negligent supervision of Cross and vicarious liability on the part of Keller Williams employees and the Goodes.  Alaskasland sought a permanent injunction and damages.

The Realtors moved to dismiss all claims.  In its opposition Alaskasland notably waived any copyright, trademark violation, and unfair competition claims under state and federal statutes.  The superior court denied the motion to dismiss.

Alaskasland moved for partial summary judgment on its misappropriation, trade name infringement, defamation, and negligent supervision claims.  The Realtors opposed and cross-moved for summary judgment on all claims.  After being granted permission during oral argument, the parties supplemented the record with expert reports.  Shortly thereafter Moore reached an agreement with the Goodes to purchase their property for $155,000.

The superior court granted summary judgment to the Realtors on all claims.  The court dismissed the "injunction" claim as moot because by then the photographs and the appraisal had been removed from the MLS website.  The court noted that Alaska has not yet recognized the tort of misappropriation, but that even if it did, Alaskasland had failed to satisfy what the court considered the tort's elements:  "1) time, labor, and money expended in the creation of the thing appropriated; 2) competition; and

3) commercial damage to the plaintiff."[1] The court implied that at least some time and labor were expended in creating the photographs and concluded that the parties were in competition, but held that "[t]his claim truly fails upon the third element, damages." The court stated: "Alaskasland has failed to provide a scintilla of evidence that any purchaser other than Mathes and Moore saw the photos."

Turning to the trade name and trademark infringement claims, the superior court explained that such claims require establishing both that: (1) "the symbol [is] recognizable to the public in a way that distinguishes it as unique to a particular business"; and that (2) "the defendant's actions . . . cause a likelihood of confusion among the relevant buyer class."[2] Because the name "Susitna Shores" is geographically descriptive, the first prong required Alaskasland to show that the name has secondary meaning — a mental connection between the trade name and a single business.[3] The court found persuasive the Realtors' argument that Alaskasland's failure to sell at least half its lots — and none in the prior two years — evidenced that its marketing efforts had failed to produce a secondary meaning in the minds of the public. The court therefore granted summary judgment dismissing the trade name and trademark infringement claims.

The superior court then explained that a defamation claim requires establishing four elements: (1) "a false and defamatory statement of or concerning plaintiff"; (2) "unprivileged publication to a third party"; (3) "fault amounting to at least

---

[1] *See Int'l News Serv. v. Associated Press*, 248 U.S. 215, 239-40 (1918).

[2] *See Alderman v. Iditarod Props., Inc.*, 32 P.3d 373, 382 (Alaska 2001).

[3] *See id.* at 384-85.

negligence"; and (4) "either per se actionability or special damages."[4]  The court suggested there was a genuine issue of fact whether the appraisal contained false and defamatory statements.  But it held there was no genuine issue as to publication because "Alaskasland has yet to identify a single individual other than Mathes and Moore [to whom] the statements were published."  Without addressing the damages element, the court granted summary judgment to the Realtors on the defamation claim.

Noting that a claim for interference with business relationships requires a potential business relationship with a third party,[5] but that Alaskasland had not identified one, the superior court granted the Realtors summary judgment on this claim.  The court then explained that Alaskasland's conspiracy to defraud claim alleged that the Realtors had inflated the Goode property's purchase price to extract more money from Alaskasland.  But because Moore had recently purchased the Goode property for $155,000, $9,000 more than the allegedly inflated price for which the Realtors had advertised it, and because Alaskasland had failed to produce evidence of an unlawful act and evidence of an agreement, the court granted the Realtors summary judgment on this claim.  Because the court dismissed all the tort claims against Cross, there could be no liability for negligent supervision or vicarious liability for Keller Williams or its employees; the court granted summary judgment on that claim as well.

The parties then stipulated to dismissing all claims against the Goodes. Alaskasland moved for reconsideration of the grant of summary judgment, arguing in part that the court had failed to consider Alaskasland's expert reports or evidence of web hits to the Goode property MLS listing when the court concluded that Alaskasland had

---

[4]    *See State v. Carpenter*, 171 P.3d 41, 51 (Alaska 2007).

[5]    *See Mattingly v. Sheldon Jackson Coll.*, 743 P.2d 356, 363 (Alaska 1987).

not suffered damages and that the appraisal had not been published. The court denied the motion.

The Realtors moved for attorney's fees, and the superior court awarded approximately $55,500 under Alaska Civil Rule 82, about 35% of the $158,688 in reasonably incurred actual fees. The court explained that it had varied the fee award upward under Rule 82(b)(3)(A), (E), (G), and (K) because Alaskasland's "claims lacked merit and because [it] unnecessarily increased the cost of litigation through the extent of the asserted claims and the motion practice that necessarily resulted from these numerous claims."

Alaskasland appealed the grant of summary judgment on its misappropriation, trade name infringement, defamation, and negligent supervision claims, as well as the attorney's fees award. We issued an order in August 2014 requiring the parties to be prepared to discuss at oral argument "whether Alaskasland's misappropriation claim for use of its photographs is preempted by section 301 of the federal 1976 Copyright Act."[6]

## III. STANDARD OF REVIEW

"We review grants of summary judgment de novo."[7] We may affirm the grant of summary judgment on alternative grounds if supported by the record.[8] "We

---

[6] Our order cited the Copyright Act, 17 U.S.C. §§ 102(a)(5), 106(1), 301(a) (2012) and two cases: *Fournier v. Erickson*, 202 F. Supp. 2d 290, 299 (S.D.N.Y. 2002) and *Henry v. Nat'l Geographic Soc'y*, 147 F. Supp. 2d 16, 21 (D. Mass. 2001).

[7] *Christensen v. Alaska Sales & Serv., Inc.*, 335 P.3d 514, 516 (Alaska 2014).

[8] *See Wiersum v. Harder*, 316 P.3d 557, 563 (Alaska 2013).

review for abuse of discretion both the determination of prevailing party status and the award of attorney['s] fees."[9]

## IV. DISCUSSION

### A. The Federal Copyright Act Preempts Alaskasland's Misappropriation Claim As It Relates To The Photographs Of Mt. McKinley And Moore's Family Fishing.

#### 1. Courts apply a two-prong analysis to determine if Federal Copyright Act preempts state law claims.

Section 301 of the 1976 Copyright Act preempts state law claims attempting to vindicate "legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright" and arising from a work "within the subject matter of copyright."[10] Congress enacted section 301 in reaction to the "anachronistic, uncertain, impractical, and highly complicated dual system" of copyright law that had developed around the premise that unpublished works deserved common law copyright whereas published works were entitled to statutory copyright.[11] Congress therefore intended section 301 to produce "national uniformity" in the law of copyright to better effectuate its constitutional purpose: "To promote the progress of science and useful arts."[12]

---

[9] *Nautilus Marine Enters. Inc. v. Exxon Mobil Corp.*, 332 P.3d 554, 557 (Alaska 2014).

[10] 17 U.S.C. § 301(a) (2012). Subsection 301(b) provides in part: "Nothing in this title annuls or limits any rights or remedies under the common law or statutes of any State with respect to . . . activities violating legal or equitable rights that are not equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106[.]"

[11] *See* H.R. REP. NO. 94-1476, at 129 (1976).

[12] U.S. Const. art. I, § 8, cl. 8. *See also* H.R. REP. NO. 94-1476, at 129 (1976) (continued...)

Pursuant to this constitutional authority, Congress in 1790 enacted the first federal patent and copyright law and ever since that time has fixed the conditions upon which patents and copyrights shall be granted. These laws, like other laws of the United States enacted pursuant to constitutional authority, are the supreme law of the land. When state law touches upon the area of these federal statutes, it is "familiar doctrine" that the federal policy "may not be set at naught, or its benefits denied" by the state law.[13]

Courts conduct a two-prong analysis modeled on section 301 to determine whether the Copyright Act preempts a state law claim.[14] The first prong of the preemption analysis determines whether the work at issue "come[s] within the subject matter of copyright as specified by sections 102 and 103" of the Act.[15] Section 102 lists categories of works "fixed in any tangible medium of expression" that are eligible for

---

[12]  (...continued)
("One of the fundamental purposes behind the copyright clause of the Constitution, as shown in Madison's comments in The Federalist, was to promote national uniformity and to avoid the practical difficulties of determining and enforcing an author's rights under the differing laws and in the separate courts of the various States. Today, when the methods for dissemination of an author's work are incomparably broader and faster than they were in 1789, national uniformity in copyright protection is even more essential than it was then to carry out the constitutional intent.").

[13]  *Sears, Roebuck & Co. v. Stiffel Co.*, 376 U.S. 225, 228-29 (1964) (citations omitted) (quoting *Sola Elec. Co. v. Jefferson Elec. Co.*, 317 U.S. 173, 176 (1942)).

[14]  *See Nat'l Basketball Ass'n v. Motorola, Inc.*, 105 F.3d 841, 848 (2d Cir. 1997); *Del Madera Props. v. Rhodes & Gardner, Inc.*, 820 F.2d 973, 976 (9th Cir. 1987), *overruled on other grounds by Fogerty v. Fantasy, Inc.*, 510 U.S. 517 (1994).

[15]  17 U.S.C. § 301(a). *See also Nat'l Basketball Ass'n*, 105 F.3d at 848 ("The subject matter requirement is met when the work of authorship being copied or misappropriated 'falls within the ambit of [copyright] protection.' " (alteration omitted) (quoting *Harper & Row, Publishers, Inc. v. Nation Enters.*, 723 F.2d 195, 200 (2d Cir. 1983), *rev'd on other grounds*, 471 U.S. 539 (1985))); *Del Madera*, 820 F.2d at 976.

copyright protection, such as literary, musical, dramatic, choreographic, and pictorial "works of authorship,"[16] and section 103 extends copyright protection to certain "compilations and derivative works."[17]

The second prong of the preemption analysis focuses on whether the state law claim attempts to vindicate the "exclusive rights" available under section 106 of the Copyright Act,[18] establishing the rights to "reproduce" the work, "prepare derivative works" based upon it, "distribute copies" of it, and "display the copyrighted work publicly."[19] The second prong ensures that the state law claim attempts to vindicate some right different in kind from those provided by the Copyright Act: "To survive preemption, the state cause of action must protect rights which are qualitatively different from the copyright rights. The state claim must have an 'extra element' which changes the nature of the action."[20] Whether the possessor of a copyrightable work registers for a copyright has no bearing on section 301's "preemptive effect."[21] Before oral argument

---

[16]     17 U.S.C. § 102(a).

[17]     17 U.S.C. § 103.

[18]     17 U.S.C. § 301(a).

[19]     17 U.S.C. § 106.

[20]     *Del Madera*, 820 F.2d at 977 (quoting *Mayer v. Josiah Wedgwood & Sons, Ltd.*, 601 F. Supp. 1523, 1535 (S.D.N.Y. 1985)); *see also Nat'l Basketball Ass'n*, 105 F.3d at 850 ("[C]ertain forms of commercial misappropriation otherwise within the general scope requirement will survive preemption if an 'extra-element' test is met.").

[21]     *Trandes Corp. v. Guy F. Atkinson Co.*, 996 F.2d 655, 658 (4th Cir. 1993).

in this appeal, we directed the parties' attention to two cases illustrating the Copyright Act's preemptive effect.[22]

In the superior court Alaskasland repeatedly characterized its misappropriation claim as a common law claim with three elements: "(1) the plaintiff must have invested time, money, or effort to extract the information, (2) the defendant must have taken the information with no similar investment, and (3) the plaintiff must have suffered a competitive injury because of the taking."[23] Alaskasland concedes that

---

[22] One was *Henry v. National Geographic Society*, 147 F. Supp. 2d. 16 (D. Mass. 2001). In that case a photographer contracted to provide photographs for a book series then later negotiated a licensing fee for the use of one of the photographs in software, but the purchaser refused to negotiate licenses for the other photographs incorporated into its software. *Id.* at 18. The photographer brought state law claims in federal court, including a conversion claim. *Id.* The district court conducted the two-prong analysis to determine whether the conversion claim was preempted by the Copyright Act. *Id.* at 20. After determining under the first prong that photographs are "subject to copyright protection" the district court analyzed under the second prong whether the conversion claim "contain[ed] an extra element that render[ed] it 'qualitatively different' from a copyright claim." *Id.* (quoting *Harper & Row, Publishers, Inc. v. Nation Enter.*, 723 F.2d 195, 201 (2d Cir. 1983), *rev'd on other grounds*, 471 U.S. 539 (1985)). The court reasoned that the conversion claim sought "to protect [the] right to reproduce" the photographs, but "[b]ecause § 106 [of the Copyright Act] also protects copyright owners from the unauthorized reproduction of the copyrighted work, the state and federal rights are equivalent, and [the] conversion claim [was] preempted." *Id.* at 21.

The other case was *Fournier v. Erickson*, 202 F. Supp. 2d 290 (S.D.N.Y. 2002), also involving photographs and holding that two state law claims — unfair competition and tortious misappropriation of goodwill — were preempted by the Copyright Act because both were "grounded solely on the allegation of unauthorized copying and subsequent use of [the] . . . photograph," and "neither of the . . . claims contain[ed] or allege[d] an extra element that distinguish[ed] them from the copyright infringement claim." *Id.* at 298-99.

[23] BLACK'S LAW DICTIONARY 1088 (9th ed. 2009). Alaskasland cited this
(continued...)

we have neither recognized nor declined to recognize this tort, and we express no opinion on its place in Alaska law; we assume only for purposes of argument that the tort includes the elements Alaskasland posits.

The gist, then, of Alaskasland's misappropriation claim is that the photographs the Realtors appended to the Goode property listing and posted on the MLS website, especially the Susitna Shores concrete sign photo, represent the time and money Alaskasland expended advertising the Susitna Shores subdivision. Although Alaskasland concedes that creating the photographs "may have cost relatively little," it urges us to account for the time it spent promoting the trade name Susitna Shores in assessing the value of the photographs and argues specifically that the Realtors' use of the Susitna Shores sign photo for the Goode property listing was intended "to create the impression that [the Goode property] was in fact part of Susitna Shores." We address the contention that the Realtors "passed off" the Goode property as belonging to the Susitna Shores subdivision in a separate section.[24]

### 2. Alaskasland's photographs come within the subject matter of copyright.

Under the first prong of the federal copyright preemption analysis, we must determine whether Alaskasland's photographs "come within the subject matter of copyright as specified by sections 102 and 103 [of the Act]."[25] Section 102(a)(5) of the Act extends copyright protection to "pictorial, graphic, and sculptural works," and the

---

[23]  (...continued)
definition in its opposition to the Realtors' motion to dismiss and in its summary judgment opposition, relied on a similar definition in its motion for partial summary judgment, and repeats these three elements to us on appeal.

[24]  *See infra* Section IV.B.

[25]  17 U.S.C. § 301(a).

Act's definitional section plainly states that this phrase includes photographs.[26] Accordingly the first prong of the preemption analysis is met.

### 3. Alaskasland's misappropriation claim fails the extra-element test at least with respect to its photographs of Mt. McKinley and of Moore's family fishing.

At oral argument before us Alaskasland contended that, because its misappropriation claim included an extra element, "the unauthorized use of plaintiff's goodwill and reputation," it could not be preempted by the Copyright Act. Alaskasland also argued that its misappropriation claim encompassed more than the mere taking of three photographs, but rather included the Realtors' "free-riding on [Alaskasland's] extensive advertising and marketing efforts."[27] To promote the Susitna Shores

---

[26] *See* 17 U.S.C. § 101.

[27] This is similar to the argument in *Del Madera Properties v. Rhodes & Gardner, Inc.*, involving a real estate development company that brought misappropriation and unjust enrichment claims based on allegations that a competitor had misappropriated a tentative subdivision map, "supporting documents, and [the] time and effort . . . spent in creating the map and supporting documents and in seeking approval of the subdivision." 820 F.2d 973, 975-76 (9th Cir. 1987), *overruled on other grounds by Fogerty v. Fantasy, Inc.*, 510 U.S. 517 (1994). After the development company filed for bankruptcy, another entity acquired the property, "hired the same consultants" that the development company had employed, "and developed the property according to the Tentative [Subdivision] Map." *Id.* at 975. Conducting the two-part preemption analysis, the Ninth Circuit Court of Appeals concluded under the first prong that the map itself was copyrightable as a "pictorial [or] graphic" work. *Id.* at 976 (citing 17 U.S.C. § 102). It then noted that "[e]ffort expended to create the Tentative Map and supporting documents is effort expended to create tangible works of authorship," and "[a]s such, . . . [was] within the scope of copyright protection." *Id.* (citing *Mayer v. Josiah Wedgwood & Sons, Ltd.*, 601 F. Supp. 1523, 1535 (S.D.N.Y. 1985)). Turning to the second prong — the extra-element test — the court noted that the development company's allegation that its former employee had breached her fiduciary duty by giving the map to its competitor did not "change[] the nature of [its] action" but rather simply

(continued...)

subdivision, Alaskasland allegedly spent nearly $45,000 on advertising, including the distribution of 50,000 informational postcards to potential buyers, and another $40,000 to create the concrete Susitna Shores subdivision sign, efforts that required nearly 900 hours of labor. Although Mathes shot the photo of the Susitna Shores sign and the photo of Mt. McKinley, and obtained from Moore the photo of Moore's family fishing on the Susitna River, Alaskasland argues that these three photographs are infused with the extensive time and money it expended in marketing Susitna Shores. But the misappropriation of "sweat equity" expended in the creation and advertisement of a copyrightable work is "precisely the type of misconduct the copyright laws are designed to guard against."[28] Accordingly Alaskasland's assertion that its photographs are the product of extensive effort and investment does not save its misappropriation claim, at

---

**27** (...continued)
restated a copyright claim. *Id.* at 977. Accordingly the "unfair competition claim for misappropriation of . . . time and effort expended in producing the Tenative map and supporting documents [was] preempted" by the Copyright Act. *Id.*

**28** *Wedgwood*, 601 F. Supp. at 1535. In *Wedgwood* an artist alleged that a pottery company wrongfully misappropriated "her time, talent[,] and effort" by copying her design. *Id.* at 1526, 1535. The district court determined that the artist's claim sounded in misappropriation because she sought to protect against the company's "competing use of a valuable product or idea [she had] created . . . through investment of time, effort, money[,] and expertise." *Id.* at 1534 (citation omitted). Concluding under the preemption analysis's first prong that the design fell "within the subject matter of the copyright laws," *id.* at 1532, the court then analyzed whether the artist's misappropriation claim "contain[ed] an 'extra element' [to] qualitatively distinguish[]" it from rights provided under copyright law. *Id.* at 1535. But because the same act — i.e., reproduction, distribution, or display — would trigger both a misappropriation and a copyright claim, and because the artist's allegation that she had been deprived of her sweat equity was "not qualitatively different from [a] . . . copyright infringement [claim]," the district court held that the Copyright Act preempted the artist's misappropriation claim. *Id.* at 1535-36.

least with respect to the mountain photo and the fishing photo, from preemption under the Copyright Act.[29]

Alaskasland defended its misappropriation claim in the superior court by arguing that the taking of the three photos included taking "the unique and stylized version of the name 'Susitna Shores' embodied in [the photograph of the subdivision] sign," into which Alaskasland had expended considerable time and money. At oral argument before us Alaskasland stated that its misappropriation claim encompassed not only the taking of the three photos, but also the misappropriation of its "advertising efforts . . . because [it] spent a lot of money and worked really hard to create [Susitna Shores'] goodwill and reputation." It did not argue to the superior court, nor to us, that the generic photograph of Mt. McKinley or the photograph of Moore's family fishing on the banks of the Susitna, both of which the Realtors used to market the Goode property, somehow embody the sweat equity and money it expended in marketing the Susitna Shores subdivision. It indisputably acquired the photographs at little cost, and asserts

---

[29] Numerous cases concerning reproduction of photographs have held that the Copyright Act preempted state law misappropriation claims because the state law claims lacked an extra element. *See, e.g.*, *Levine v. Landy*, 832 F. Supp. 2d 176, 191-92 (N.D.N.Y. 2011) (holding Copyright Act preempted photographer's misappropriation claim when claim did not have extra element, such as breach of fiduciary duty); *CoStar Grp. Inc. v. LoopNet, Inc.*, 164 F. Supp. 2d 688, 691-92, 712-14 (D. Md. 2001) (holding misappropriation claim by real estate information service provider against website using service's photographs was preempted by Copyright Act because claim had no extra element); *Deo v. Gilbert*, No. 260847, 2005 WL 2323808, at *1, *5 (Mich. App. Sept. 22, 2005) (per curiam) (holding in suit between sellers of historic photographs Copyright Act preempted state law claim based on "right to exclusive reproduction" of photographs); *Editorial Photocolor Archives, Inc. v. Granger Collection*, 463 N.E.2d 365, 366, 368 (N.Y. 1984) (holding in suit between film and photograph archive companies that Copyright Act preempted misappropriation claim and "[p]laintiffs could not, by miscasting their causes of action, secure the equivalent of copyright protection under guise of State law").

comparable stock photos would have cost under $5,000, a sum far less than the $100,000 in damages it claims to have suffered from the Realtors' misappropriation of its photographs.

And in explaining the nexus between its photographs and its advertising costs, Alaskasland stresses that the Realtors must have seen "value in the use of the 'Susitna Shores' logo and likeness in marketing their own property, or else they would not have used the photos and logo to market the Goode Property." But Alaskasland does not further articulate its argument that its photo of a mountain and its photo of a family fishing represent the time and effort it expended in marketing Susitna Shores. And even if time, energy, and effort were expended in the creation of these two photographs, protection of this exertion falls exclusively under the ambit of the Copyright Act.[30] With respect at least to these two photographs, Alaskasland offers no "extra element" to save its misappropriation claim from preemption: it simply claims that they were taken "without permission" and that Alaskasland had circulated them to the public before. Because photographs come within the subject matter of copyright, and because the Copyright Act provides a copyright holder exclusive rights for their reproduction, distribution, and display — the same rights Alaskasland asserts in its misappropriation claim — the Copyright Act preempts Alaskasland's misappropriation claims with respect to the mountain photo and the fishing photo.[31] Thus if Alaskasland desired to prevent

---

[30] *See Del Madera Props.*, 820 F.2d at 976-77; *Wedgwood*, 601 F. Supp. at 1535.

[31] 17 U.S.C. §§ 101, 102(5), 106(1), (3), (5), 301(a). *See also Ehat v. Tanner*, 780 F.2d 876, 878 (10th Cir. 1985) (holding that even if Utah law recognized tort of misappropriation, such a claim would be preempted by Copyright Act).

these photographs from being reproduced and displayed without its permission, it should have sought an injunction under the Copyright Act.[32]

B. **Although The Copyright Act Does Not Preempt A Passing Off Claim, Such A Claim Requires Damages, Which Alaskasland Failed To Support With Respect To The Photograph Of The Susitna Shores Subdivision Sign.**

In response to our order directing the parties' attention to the Copyright Act's preemptive effect, Alaskasland contended at oral argument before us that its misappropriation claim included a claim for "passing off," defined as "selling a good or service of one person's creation under the name or mark of another."[33]  Although this is the first time Alaskasland styled its misappropriation claim as one for passing off, it has argued throughout this litigation that by listing the Goode property alongside a photo of Alaskasland's Susitna Shores sign, the Realtors intended "to create the impression that [the Goode property] was in fact part of Susitna Shores."  Because a passing off claim requires an extra element of "misrepresentation or deception," it is not preempted by the Copyright Act.[34]  But as with Alaskasland's misappropriation claim, we express no

---

[32] To claim infringement one must first register a work with the federal copyright registry.  *See Trandes Corp. v. Guy F. Atkinson Co.*, 996 F.2d 655, 658 (4th Cir. 1993) (noting owner of copyrightable work "cannot escape the [Copyright Act's] preemptive effect . . . merely by failing to register its copyright").

[33] *Lamothe v. Atl. Recording Corp.*, 847 F.2d 1403, 1406 (9th Cir. 1988) (citing *Smith v. Montoro*, 648 F.2d 602, 604 (9th Cir. 1981)); *see also W. Star Trucks, Inc. v. Big Iron Equip. Servs. Inc.*, 101 P.3d 1047, 1053 n.29 (Alaska 2004) (noting that passing off "action was historically available whenever one trader diverted patronage from a rival by falsely representing that his goods were the goods of his rival").

[34] 1 MELVILLE B. NIMMER & DAVID NIMMER, NIMMER ON COPYRIGHT § 1.01[B][1][e], 1-35 (2015); *see also Warner Bros. Inc. v. Am. Broad. Cos.*, 720 F.2d 231, 247 (2d Cir. 1983) (noting that passing off claims protect "rights [not] equivalent (continued...)

opinion whether Alaska recognizes the common law tort of passing off, and assume only for purposes of argument its contours as defined by Alaskasland.[35]

At oral argument Alaskasland urged us to apply the definition of passing off articulated in *Aagard v. Palomar Builders, Inc.*[36] But even if Alaska recognized the

---

[34]    (...continued)
to those protected by copyright and therefore do not encounter preemption") (citation omitted); H.R. REP. NO. 94-1476, at 132 (1976) ("Section 301 is not intended to preempt common law protection in cases involving activities such as false labeling, fraudulent representation, and passing off even where the subject matter involved comes within the scope of the copyright statute.").

[35]    Alaskasland chose to assert its common law unfair competition claim of misappropriation, a claim it suggests encompasses passing off, despite the lack of Alaska precedent to support such a claim. We surmise in passing that our case law holding that the Unfair Trade Practices and Consumer Protection Act (UTPA) does not apply to real estate sales, *see, e.g.*, *Alaska Trustee, LLC v. Bachmeier*, 332 P.3d 1, 5-6 (Alaska 2014), may have informed Alaskasland's choice. We do not decide whether the UTPA impacts Alaskasland's claims because neither party raised the issue.

[36]    344 F. Supp. 2d 1211 (E.D. Cal. 2004). In that case a designer and builder of residential homes employed another home designer to resize architectural plans. *Id.* at 1213. The second designer copyrighted some of the plans without permission then sued the original designer for copyright infringement; the original designer counterclaimed for misappropriation and also asserted a state law unfair business practices claim. *Id.* at 1213-15. The district court treated the common law misappropriation counterclaim as "identical" to the state law unfair competition counterclaim; one element necessary to establishing either claim was a showing that the conduct had caused injury. *See id.* at 1216. The allegation that customers purchased the plans believing they were the first designer's, allowing the second designer to leverage "industry reputation to promote her own business," stated a traditional passing off claim not preempted by the Copyright Act. *See id.* at 1216-17. The court noted that the first designer's plans "were recognized nationally for unique and distinctive features." *Id.* at 1213 (internal quotation marks omitted). The claim survived the extra element test because the court found consumers had believed the plans were the first designer's, and because the second designer sold many plans to her customers, presumably satisfying the

(continued...)

common law tort of passing off, Alaskasland's claim would fail for lack of damages. In denying Alaskasland's motion for partial summary judgment and granting the Realtors' cross-motion with respect to misappropriation, the superior court stated that Alaskasland "failed to show evidence of any damages." We agree. Unlike in *Aagard*, involving an allegation that many design plans had been deceitfully sold under a business competitor's name,[37] the only relevant sale here occurred when Alaskasland itself purchased the Goode property for $155,000 shortly before the superior court granted summary judgment in the Realtors' favor. Alaskasland argues that the Realtors "passed off" the Goode property as part of the Susitna Shores subdivision, but there is no evidence that anyone was deceived — certainly Alaskasland knew that the property it was purchasing was not part of its subdivision[38] — or that (1) the Realtors profited from the alleged passing off or (2) Alaskasland actually was harmed by the alleged passing off.

When deposed Moore stated that during a Susitna Shores open house in October 2011, one attendee specifically expressed interest in the Goode property, which Alaskasland did not then know was for sale, but expressed no interest in Susitna Shores' lots. Moore could name no one who wanted to purchase the Goode property because they believed it was within the Susitna Shores subdivision, let alone anyone interested in purchasing a Susitna Shores lot who instead purchased the Goode property. Moore remembered an individual who made a nonrefundable down payment on a lot and then

---

[36]    (...continued)
tort's injury requirement. *Id.* at 1216-17. The passing off counterclaim survived a motion to dismiss on the merits. *Id.*

[37]    *Id.* at 1213-14.

[38]    *Cf. id.* at 1217 ("[M]any home builders believed they were purchasing a Palomar Plan — possibly with Palomar's approval — when they entered into business with Aagard.").

did not purchase it, but Moore did not attribute this lost sale to the Realtors' use of Alaskasland's Susitna Shores sign photo.

Alaskasland contends that a genuine issue of material fact remains with respect to the damages it suffered from the Realtors' use of its stylized sign photo because dozens of people viewed the Realtors' Goode property listing online, and the listing included that photo. But that fact is not material.[39] Alaskasland has demonstrated no injury from these online viewings and does not connect them to any diversion of profits from Alaskasland to the Realtors. It cannot show that any individual who viewed the Susitna Shores sign photo expressed interest in the Goode property or lost interest in purchasing Susitna Shores' property as a result of the Realtors' use of that photo. Because Alaskasland's damages are only hypothetical, its claim fails as a matter of law.[40]

In the same vein Alaskasland argues that its two expert reports create a genuine issue of material fact with respect to damages and that the superior court neglected to consider this evidence. Neglecting to mention the expert reports does not necessarily mean that the court failed to consider them in its ruling — the court stated

---

[39] *See Christensen v. Alaska Sales & Serv., Inc.*, 335 P.3d 514, 519 (Alaska 2014) ("[A] material fact is one upon which resolution of an issue turns." (citation omitted)).

[40] *Cf. Orsini v. Bratten*, 713 P.2d 791, 794 n.6 (Alaska 1986) ("Damages should not be awarded on the basis of speculation, surmise or conjecture.") (citation omitted); *State v. Hammer*, 550 P.2d 820, 824-25 (Alaska 1976) ("Loss of profits damages have been awarded in a variety of civil contexts, including tort actions . . . and suits for infringement of a patent or trademark. In any case seeking loss of profits, such damages must be 'reasonably certain': the trier of fact must be able to determine the amount of lost profits from evidence on the record and reasonable inferences therefrom, not from mere speculation and wishful thinking. Thus, claims which are truly speculative, in that they depend on unrealized contingencies . . . or the like, are screened out by the requirements of reasonable certainty, while damages which can be proven are allowed." (footnotes omitted)).

that it would consider both parties' expert reports before issuing a decision, and it may simply have found them unhelpful.[41] One of Alaskasland's expert reports assumes that Alaskasland would have licensed its photos to the Realtors for a fee and then increases that fee ten-fold because the photo licensing company upon whose policy the expert relied similarly increases its fees when photos are "used illegally in some manner." The expert report notes that the Copyright Act provides for statutory damages if the " 'infringement was committed willfully' "[42] and calculates damages accordingly. But to the extent that Alaskasland claims damages for the unauthorized use of its photographs, this type of misappropriation claim, as discussed above, is preempted by the Copyright Act.[43]

The expert reports also detail the money Alaskasland spent advertising Susitna Shores by preparing "[a]rt," attending "[t]rade show[s]" and "other promotions," constructing its stylized sign, and designing and maintaining its website. Using this sum, $361,827, one expert reasons that Alaskasland spent "$15,870 per acre" in promoting the lots it sold and then contends that, because the Realtors marketed the 4.6 acre Goode property and because they used Alaskasland's "advertising [and] not just the photos," they damaged Alaskasland in the amount of "$73,000 (4.6 acres x $ 15,870 per acre

---

[41]     *Cf. Monette v. Hoff*, 958 P.2d 434, 436 (Alaska 1998) ("Assessment of witness credibility is left to the discretion of the superior court." (citing *Hanlon v. Hanlon*, 871 P.2d 229, 232 (Alaska 1994))). One expert report, for instance, stated that Alaskasland suffered $120,000 in damages because it was "forced" to purchase the Goode property for $155,000 even though "the real fair market value of [that] parcel was $35,000." It is difficult to discern how Alaskasland was "forced" into overpaying for the property but simple to discern that Alaskasland would pay a premium for the Goode property, surrounded as it was by the Susitna Shores subdivision.

[42]     *See* 17 U.S.C. § 504(c)(2) (2012).

[43]     *See supra* notes 25-32 and accompanying text.

promotion costs)." (Emphasis omitted.) But these novel calculations fail to create a reasonable inference that the Realtors profited at Alaskasland's expense or that Alaskasland suffered an actual loss. Finally, Alaskasland's other expert report states that, by using the sign photo and "keywords" similar to Alaskasland's, the Realtors' listing "dilut[ed] the online marketing efforts of Susitna Shores." The report notes that "searching for 'Susitna Shores' . . . *would* affect the search engine rankings negatively for Susitna Shores and positively for the [Realtors'] online listings." (Emphasis added.) It may be that online dilution of search results for the term "Susitna Shores" is a distinct possibility, but no evidence in the record creates a genuine issue of fact as to Alaskasland's actual injury from possible online marketing dilution. Even taken together and construed in Alaskasland's favor,[44] its experts' reports fail to raise a genuine issue of material fact as to any actual damages it suffered from the Realtors' use of the Susitna Shores sign photo.

Alaskasland has not demonstrated that the Realtors "passed off" the Goode property to any deceived purchaser — rather, Alaskasland bought the property. Even assuming its passing off claim's validity for the sake of argument, Alaskasland has produced no evidence of deception or damages. Regardless of how Alaskasland characterizes its claim concerning the Realtors' use of the Susitna Shores sign photo, its claim necessarily fails.

1. **A reasonable royalty measure of damages is inappropriate for a passing off claim.**

Alaskasland urges us to follow other courts that "employ a 'reasonable royalty' measure of damages in cases where [d]efendants did not profit from their

---

[44] *See Lockwood v. Geico Gen. Ins. Co.*, 323 P.3d 691, 696 (Alaska 2014) (explaining that on review of summary judgment ruling record is read in light "most favorable to the non-moving party" with "all reasonable inferences drawn in its favor").

misappropriation." A reasonable royalty "is a measure of damages for past infringement, often used in patent cases and in the context of trade secrets, but its use in trademark has been atypical."[45] "Trade secret law places a premium on the value of secrecy, and creates exclusive rights in the holder of the secret."[46]

A reasonable royalty cannot serve as a measure of damages here because the photograph of Alaskasland's concrete sign is simply not a trade secret, visible as it is to anyone traveling the Parks Highway. We decline to apply a measure of damages derived from trade secret law to the claim for misappropriation of the sign photograph as an end-run around the latter's damage requirement.

The cases Alaskasland invokes to support its argument are distinguishable. In Sheldon v. Metro-Goldwyn Pictures Corp. the United States Supreme Court approved the use of a reasonable royalty as a measure of damages only *after* copyright infringement liability had been established: The reasonable royalty calculation itself does not establish that an injury has occurred.[47] Alaskasland also points to *ITT Corp. v.*

---

[45]    *A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 166 F.3d 197, 208 (3d Cir. 1999); *accord Vt. Microsystems, Inc. v. Autodesk, Inc.*, 138 F.3d 449, 450 (2d Cir. 1998). *See also* RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 45 cmt. g (1995) ("A reasonable royalty measure of relief awards to the plaintiff the price that would be set by a willing buyer and a willing seller for the use of the *trade secret* made by the defendant." (emphasis added)).

[46]    *LinkCo, Inc. v. Fujitsu Ltd.*, 230 F. Supp. 2d 492, 504 (S.D.N.Y. 2002).

[47]    309 U.S. 390, 396-400 (1940). The lawsuit involved a film that plagiarized material from a copyrighted play and considered whether and how to apportion profits between the film company and the play's copyright holder. *Id*. at 396-98. The Court apportioned the profits, relying on its patent law precedent: " 'The infringer is liable for actual, not for possible, gains. The profits, therefore, which he must account for, are not those which he might reasonably have made, but those which he did make, by the use of the plaintiff's invention . . . .' " *Id.* at 400 (quoting *Tilghman v. Proctor*, 125 U.S. 136,

(continued...)

*Xylem Group, LLC*, a case which, like *Sheldon*, simply noted that if the plaintiff succeeds in proving trademark infringement, then "a reasonable royalty is a viable measure of damages."[48]

> ## 2. Alaskasland's common law trade name infringement claim is indistinguishable from its passing off claim and also fails for lack of damages.

At oral argument before us Alaskasland conceded that its misappropriation or passing off claim was "bigger than" and therefore included its trade name and trademark infringement claims. We discern no meaningful difference between Alaskasland's passing off claim — alleging the Realtors marketed the Goode property as though it were within the Susitna Shores subdivision — and its common law trade name infringement claim, which also alleges that the Realtors used the sign photo to "creat[e] the impression that the Goode Property was part of Susitna Shores." "At common law . . . tradename infringement was only one form of tort encompassed under the concept of unfair competition, a concept that also included passing off one's goods

---

[47]  (...continued)
146 (1888), *superseded by statute on other grounds*, Act of August 1, 1946, c. 726, § 1, 60 Stat. 778, *as recognized in Gen. Motors Corp. v. Devex Corp.*, 461 U.S. 648, 651-52 (1983)).

[48]  963 F. Supp. 2d 1309, 1331 (N.D. Ga. 2013). *See also* Michael A. Rosenhouse, Annotation, *Proper Measure and Elements of Damages for Misappropriation of Trade Secret*, 11 A.L.R. 4th 12, 20 (1982) ("In the absence of circumstances indicating what the parties thought the plaintiff's trade secret was worth, the courts, in measuring damages for a misappropriation, *seem to have been guided substantially by what the plaintiff has proved*. Thus, they have awarded the plaintiff his lost profits . . . or an accounting for the defendant's profits . . . upon proper and sufficient evidence as to the amount thereof, both measures being deemed acceptable in general by most courts . . . ." (emphasis added)).

as those of another . . . ."[49]  We also note that on the facts of this case, there is no meaningful difference between Alaskasland's trade name and trademark infringement claims because "the law affords protection against [the misappropriation of either] upon the same fundamental principles."[50]

As with a passing off claim, to recover damages under a trade name infringement claim "plaintiff must prove both causation and amount."[51]  Even assuming the name Susitna Shores acquired secondary meaning, Alaskasland failed to show that it suffered any actual damages from the Realtors' use of its sign photograph in their listing.  We therefore conclude that the superior court properly granted summary judgment to the Realtors on Alaskasland's common law trade name infringement claim.[52]

---

[49]  *20th Century Wear, Inc. v. Sanmark-Stardust Inc.*, 747 F.2d 81, 90 (2d Cir. 1984) (internal quotation marks omitted) (citing *Am. Steel Foundries v. Robertson*, 269 U.S. 372, 380 (1926)); *see also Maguire v. Gorruso*, 800 A.2d 1085, 1088 n.1 (Vt. 2002) ("Common law unfair competition includes a number of different tort theories, including 'passing-off,' which is in effect the common law name for trademark infringement, trade-secret violations, and misappropriation." (citing PROSSER & KEETON, THE LAW OF TORTS § 130, at 1015-20 (5th ed.1984))).

[50]  *Alderman v. Iditarod Props., Inc.*, 32 P.3d 373, 381 (Alaska 2001) (quoting *Robertson*, 269 U.S. at 380).  "The distinction between trade name and trademark . . . is generally not a critical distinction."  *Id.*  Alaskasland used these terms interchangeably throughout its arguments to the superior court and to us.

[51]  5 J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 30:72, at 30-200 (4th ed. 2015); *see also* RESTATEMENT (THIRD) OF UNFAIR COMPETITION §§ 20 cmt. b (1995) (noting that modern cases treat trademark and trade name claims similarly and that "the standard of infringement is the same"); *id.* § 36 ("One who is liable to another . . . for infringement of the other's . . . trade name . . . is liable for the pecuniary loss to the other *caused by* the . . . infringement . . . ." (emphasis added)).

[52]  We also note that the standard remedy for trademark infringement is an
(continued...)

**C.    Alaskasland's Defamation Claim Fails Because The Two Statements In The Appraisal Are Non-Defamatory Opinions.**

A defamation claim requires proof of four elements: "(1) a false and defamatory statement; (2) unprivileged publication to a third party; (3) fault amounting at least to negligence; and (4) either per se actionability or special damages."[53]  In granting summary judgment to the Realtors the superior court suggested there was a genuine issue of fact whether the appraisal contained false and defamatory statements, but ruled that the statements were not published and that the Realtors were not negligent in posting the appraisal.  We affirm on the alternative ground that the statements are non-defamatory opinions.[54]

The tort's first element — whether a statement is defamatory — is a question of law.[55]  "The First Amendment bars actions for defamation where the allegedly defamatory statements are expressions of ideas and 'cannot reasonably be

---

[52]    (...continued)
injunction.  5 MCCARTHY, *supra* note 52, at § 30:1.  The superior court correctly concluded that Alaskasland's injunction claim was moot.  When there is no proof of passing off, and when the infringement neither damaged the plaintiff nor profited the infringer, damages will not be awarded because "an injunction will satisfy the equities of the case." *Champion Spark Plug Co. v. Sanders*, 331 U.S. 125, 130-32 (1947); *see also* RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 35 & cmt. a (1995) (stating "judicial preference for injunctive relief in unfair competition cases" involving "deceptive marketing, trademark infringement, and trademark dilution"); *id.* § 36 & cmt. i (stating that "the recovery of damages ordinarily requires proof that some consumers have actually been confused or deceived").

[53]    *State v. Carpenter*, 171 P.3d 41, 51 (Alaska 2007) (citing *French v. Jadon, Inc.*, 911 P.2d 20, 32 (Alaska 1996)).

[54]    *See supra* note 8 and accompanying text.

[55]    *DeNardo v. Bax*, 147 P.3d 672, 677 (Alaska 2006) (citing *Schneider v. Pay'N Save Corp.*, 723 P.2d 619, 624-25 (Alaska 1986)).

interpreted as stating actual facts about an individual.' "[56] "To ascertain whether a statement is factual," we will "consider 'the type of language used, the meaning of the statement in context, whether the statement is verifiable, and the broader social circumstances in which the statement was made.' "[57] Even if a statement is an opinion, it may give rise to a defamation claim if its "expression contains an implied assertion of false fact and is sufficiently derogatory as to cause harm to the subject's reputation."[58] But " 'if it is plain that the speaker is expressing a subjective view, an interpretation, a theory, conjecture, or surmise, rather than claiming to be in possession of objectively verifiable facts, the statement is not actionable.' "[59] The tension in this area of the law concerns the appropriate balance between the First Amendment's protections and

---

[56] *Sands v. Living Word Fellowship*, 34 P.3d 955, 960 (Alaska 2001) (quoting *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 20 (1990)).

[57] *Id.* (quoting *Milkovich*, 497 U.S. at 24 (Brennan, J., dissenting)); *see also Kinzel v. Discovery Drilling, Inc.*, 93 P.3d 427, 440 (Alaska 2004) (emphasizing that whether statement is fact or opinion depends upon totality of circumstances, including " 'all the words used,' " any " 'cautionary terms,' " and statement's audience (quoting *Lyons v. Globe Newspaper Co.*, 612 N.E.2d 1158, 1162 (Mass. 1993))).

[58] *Carpenter*, 171 P.3d at 51 (citing RESTATEMENT (SECOND) OF TORTS § 566 cmt. a (1977)).

[59] *Kinzel*, 93 P.3d at 440 (quoting *Haynes v. Alfred A. Knopf, Inc.*, 8 F.3d 1222, 1227 (7th Cir. 1993)).

society's " 'strong interest in preventing and redressing attacks upon reputation.' "[60]

" 'Whatever is added to the field of libel is taken from the field of free debate.' "[61]

Alaskasland argues that there are two false and defamatory statements in Brooker's 21-page Goode property appraisal, which was available on the realtor-only FlexMLS website. The first statement concerns Susitna Shores' electric service:

> Matanuska Electric Association [(MEA)] Engineering Department staff was unable to provide the exact location of closest electric service or estimate the expense of bringing electric service to the subject site. No map regarding electric service in place for Susitna Shores is available *according to the engineer interviewed*. The electric service in the surrounding subdivision *may be subject to legal issues* due to lack of MEA participation in construction of the infrastructure. The exact nature of the difficulty, *if any*, *was not disclosed by the staff member interviewed*. It is assumed that the availability and expense of providing electric service for the subject is equivalent to that of other land advertised to have electric "in area."

(Emphases added.) Alaskasland argues that the electricity statement about possible legal issues is defamatory because MEA actually had accepted Susitna Shores' electric service, implying that it could not therefore be subject to "legal issues."

The second statement concerns Susitna Shores' gated security:

> [T]he [Goode property] is the single remaining uncaptured lot within the subdivided area; the subject has an undeniable access right that crosses the access to [the] subdivision boat

---

[60] *Milkovich*, 497 U.S. at 22 (quoting *Rosenblatt v. Baer*, 383 U.S. 75, 86 (1966)); *see also Ollman v. Evans*, 750 F.2d 970, 974 (D.C. Cir. 1984) (noting that striking proper balance between First Amendment and "an individual's interest in reputation" is "delicate and sensitive task").

[61] *Milkovich*, 497 U.S. at 36 (Brennan, J., dissenting) (quoting *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 272 (1964)).

ramp — and that access *could be* developed and *probably* left open, thereby defeating the gated subdivision.

(Emphases added.) Alaskasland argues the gated security statement is defamatory because "no matter how the Goode Property was developed, Susitna Shores could always maintain the security of its gated community and road."

1. **Applying the *Sands v. Living Word Fellowship* factors leads to the conclusion that both statements are opinions.**

To determine whether the statement is an opinion we apply the four *Sands* factors: " 'the type of language used, the meaning of the statement in context, whether the statement is verifiable, and the broader social circumstances in which the statement was made.' "[62]

The first *Sands* factor considers "the type of language used."[63] Brooker's carefully chosen language conveys his appraisal's limitations. The paragraph containing the electricity statement references MEA's employees three times and conveys that Brooker interviewed MEA "staff." But Brooker spoke to only a few people: "No map regarding electric service . . . is available according to the engineer interviewed"; and "[t]he exact nature of the difficulty, if any, was not disclosed by the staff member interviewed."

The allegedly defamatory electricity statement — "The electric service in the surrounding subdivision may be subject to legal issues due to lack of MEA participation in construction of the infrastructure" — likely contains the phrase "may be" to connote Brooker's uncertainty about the existence of legal issues.[64] After reading the

---

[62] 34 P.3d at 960 (quoting *Milkovich*, 497 U.S. at 24 (Brennan, J., dissenting)).

[63] *Id*. (internal quotation marks omitted).

[64] *See Kinzel*, 93 P.3d at 440 (" '[T]he court must give weight to cautionary (continued...)

paragraph one could conclude that the engineer Brooker interviewed could not provide a map of the electric service in Susitna Shores and that "the staff member" Brooker interviewed did not disclose whether Susitna Shores' electric service had any legal issues.

The gated security statement contains the cautionary and speculative terms "could be" and "probably." Brooker's use of hedging language would suggest to a reasonable reader that a compromise of the gated subdivision's integrity is only a possibility, not a certainty. Both statements contain declarative yet cautionary language.

The second *Sands* factor considers the statement's meaning in context.[65] The alleged defamatory statements appear in an appraisal, by statutory definition an opinion.[66] After noting that Susitna Shores "may" have "legal issues" — "if any" — with its electric service, Brooker then noted the minimal impact of this possible impediment on the Goode property: "It is assumed that the availability and expense of providing electric service for the subject is equivalent to that of other land advertised to have electric 'in area.' " Brooker commented on the subdivision's electric service later in the appraisal, writing: "Susitna Shores subdivision has underground electric and telephone utilities [and] gravel surfaced streets . . . ." After mentioning the possible existence of "legal issues" with Susitna Shores' electric service once, Brooker does not

---

[64]     (...continued)
terms used by the person publishing the statement.' " (quoting *Lyons v. Globe Newspaper Co.*, 612 N.E.2d 1158, 1162 (Mass. 1993))).

[65]     34 P.3d at 960; *see also* RESTATEMENT (SECOND) OF TORTS § 614 cmt. d (1977) ("[T]he context of written or spoken words is an important factor in determining the meaning that they reasonably might convey to the person who heard or read them.").

[66]     *See* AS 08.87.900(2).

raise this issue again, suggesting that the possibility of legal issues was remote.[67] Moreover, the appraisal's purpose was to establish the value of the Goode property, and it was meant to be read by prospective purchasers of that property, not by prospective purchasers of Susitna Shores' lots.

The contextual meaning of the gated security statement becomes more apparent after viewing maps of the area, some of which were attached to Brooker's appraisal. Brooker stated that he relied on maps and photographs in arriving at his opinion of the property's value, noting that the Goode property's access easement crossed Susitna Shores' boat launch road. Similarly one map in the record, although not attached to the Brooker appraisal, shows that Susitna Shores' boat launch easement intersects the Goode property's access easement. In the context of the entire appraisal, including the maps, the statement that the gated subdivision's integrity might be compromised does not seem implausible.

The third *Sands* factor is " 'whether the statement is verifiable.' "[68] Brooker wrote that Susitna Shores' electric service "may be subject to legal issues due to lack of MEA participation in construction of the infrastructure. The exact nature of the difficulty, if any, was not disclosed by the staff member interviewed."[69] The possibility

_____

[67] *See Partington v. Bugliosi*, 56 F.3d 1147, 1153 (9th Cir. 1995) (explaining that in analyzing a defamation claim "the general tenor of the entire work" should be taken into account).

[68] 34 P.3d at 960 (quoting *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 24 (1990) (Brennan, J., dissenting)).

[69] Although Alaskasland argues that Brooker's statement is false because MEA accepted the electric service installed at Susitna Shores, the MEA employees Brooker interviewed did not disclose this information. A statement's defamatory nature depends on "whether reasonable readers would have actually interpreted the statement

(continued...)

that something will occur in the future cannot be verified: it is always technically true to state that an occurrence is possible. A statement is not a fact if it cannot plausibly be verified.[70] We have previously noted that a statement's unverifiability favors concluding that the statement is an opinion and not a fact.[71]

Like the electricity statement, the gated security statement cannot be verified because it speculates that a future event is possible. Relying on the affidavit of its general manager, Asbury Moore, Alaskasland argues that "no matter how the Goode Property was developed, Susitna Shores could always maintain the security of its gated community and road." When deposed Moore stated: "[The Goodes] have access north and south. They don't have access east and west. So we *could* put up a fence and a gate

---

[69]    (...continued)
as implying defamatory facts," not on whether the statement, stripped of its context, is verifiable in the abstract. *See Milkovich*, 497 U.S. at 27 n.3 (Brennan, J., dissenting). Moreover, Brooker's assertion that the subdivision's electric service "may be subject to legal issues" is unverifiable.

[70]    *See Janklow v. Newsweek, Inc.*, 788 F.2d 1300, 1302 (8th Cir. 1986) ("A statement regarding a potentially provable proposition can be phrased so that it is hard to establish, or it may intrinsically be unsuited to any sort of quantification."); *Ollman v. Evans*, 750 F.2d 970, 979 (D.C. Cir. 1984) ("Insofar as a statement lacks a plausible method of verification, a reasonable reader will not believe that the statement has specific factual content.").

[71]    *See State v. Carpenter*, 171 P.3d 41, 48, 51-52 (Alaska 2007) (reasoning that sexual insults made during a radio show known for its lewdness "were not factually verifiable" and therefore, although "offensive to any rational person," the statements "were not defamatory"); *Sands*, 34 P.3d at 960 (holding statements that a church was a "cult" and its pastor a "cult recruiter" were "not factual statements capable of being proven true or false," and therefore could not support a defamation action); *see also Ollman*, 750 F.2d at 981 ("In assessing whether the challenged statements are facts, rather than opinion, courts should . . . consider the degree to which the statements are verifiable . . . . The reason for this inquiry is simple: a reader cannot rationally view an unverifiable statement as conveying actual facts." (citation omitted)).

[parallel to, but not intersecting, the Goode's access easement]." (Emphasis added.) That Moore stated he "could put up a fence" connotes that one did not currently exist.[72] As Moore's deposition testimony illustrates, the statement that Susitna Shores' gated security could be defeated postulates a future event and is therefore unverifiable, which favors concluding that the statement is an opinion and not a fact. We note that Alaskasland marketed three Susitna Shores lots as providing "gated or non-gated entry," which contradicts the proposition that the whole subdivision was entirely fenced.

The fourth *Sands* factor examines " 'the broader social circumstances in which the statement was made.' "[73] Brooker wrote a professional appraisal to value a parcel of real estate.[74] Appraisers serve an important social function by reducing the value of real estate to a firm number to promote its free alienation.[75] Accordingly they should be free to express their complete and candid opinions in the interest of providing the real-estate-buying public with the most practical and detailed information possible.

_____

[72] *See* AMERICAN HERITAGE DICTIONARY 426 (3d ed. 1992) (defining "could" as an auxiliary verb "[u]sed to indicate ability [or] possibility . . . . [u]sed with hypothetical or conditional force . . . . [or] [u]sed to indicate tentativeness or politeness").

[73] 34 P.3d at 960 (quoting *Milkovich*, 497 U.S. at 24 (Brennan, J., dissenting)).

[74] *See* AS 08.87.900(2) (defining "appraisal" as "an analysis, opinion, or conclusion prepared by a real estate appraiser relating to the nature, quality, value, . . . or utility of specified interests in, or aspects of, identified real estate"); *see also Ketchikan Cold Storage Co. v. State*, 491 P.2d 143, 151 (Alaska 1971) ("The appraisal of property is not an exact science. It requires a complex balancing of the various principles and techniques which are utilized in reaching the final estimate of value.").

[75] *See, e.g., BP Pipelines (Alaska) Inc. v. State, Dep't of Revenue*, 325 P.3d 478, 483 (Alaska 2014) (stating Appraisal Institute "defines market value as [t]he most probable price, as of a specified date . . . for which the specified property rights should sell after reasonable exposure in a competitive market under all conditions requisite to a fair sale" (quoting APPRAISAL INST., THE APPRAISAL OF REAL ESTATE 23 (13th ed. 2008)) (internal quotation marks omitted)).

And real estate agents such as the Realtors here, who routinely rely on appraisals, should not be burdened with a duty to independently verify every speculative or factual assertion within an appraisal, a time-consuming and cumbersome endeavor. Safeguards exist for reprimanding negligent or incompetent real estate appraisers,[76] and we decline here to invent a sweeping rule making real estate agents vicariously liable for the alleged misdeeds of appraisers upon whose appraisals these agents rely for their livelihoods. The broader social circumstances surrounding real estate appraisals weigh in favor of free speech, within reason, and against the imposition of liability.

Weighing these four factors — Brooker's use of cautionary language, the single reference to legal issues in his lengthy appraisal, the maps attached to the appraisal, the statements' unverifiability, and the broader social circumstances in which the statements were made — we conclude that both statements are opinions.[77] But as an opinion, a statement may still be defamatory if it "contains an implied assertion of false fact."[78]

### 2. Neither statement implies the knowledge of undisclosed facts as its basis.

Drawing all reasonable inferences in Alaskasland's favor, Brooker disclosed the following facts. With respect to the electricity statement, Brooker disclosed that he spoke to one MEA employee who could not produce a map of Susitna Shores'

---

[76] *See* AS 08.87.200-.210.

[77] *See* RODNEY A. SMOLLA, LAW OF DEFAMATION § 6:1 (2d ed. 2015) (noting that the purpose of defamation law's distinction between fact and opinion is to achieve "an accommodation between protection of valuable interests in reputation and the provision of sufficient breathing space for critical and sometimes caustic free expression").

[78] *State v. Carpenter*, 171 P.3d 41, 51 (Alaska 2007) (citing RESTATEMENT (SECOND) OF TORTS § 566 cmt. a (1977)).

electric service and that he spoke to another MEA employee who said MEA did not participate in the infrastructure but did not disclose whether Susitna Shores' electric service was subject to legal "difficulty." From these two facts, Brooker hypothesized that Susitna Shores' electric service "may be subject to legal issues due to the lack of MEA participation in construction of the infrastructure." A reasonable reader would understand that a few people in an organization likely do not have the same institutional knowledge as the organization itself. And a reader of this appraisal would be free to draw a different conclusion, especially in light of the hedging language — "may be" and "if any" — that Brooker used. As Justice Brennan aptly explained in his *Milkovich v. Lorain Journal Co.* dissent:

> Conjecture, when recognizable as such, alerts the audience that the statement is one of belief, not fact. The audience understands that the speaker is merely putting forward a hypothesis. Although the hypothesis involves a factual question, it is understood as the author's "best guess." Of course, if the speculative conclusion is preceded by stated factual premises, and one or more of them is false and defamatory, an action for libel may lie *as to them*. But the speculative conclusion itself is actionable only if it implies the existence of another false and defamatory fact.[79]

Brooker qualified his 21-page appraisal with a one-page "certificate of appraisal" certifying:

---

[79] 497 U.S. 1, 28 n.5 (1990) (Brennan, J., dissenting) (emphasis in original); *see also Partington v. Bugliosi*, 56 F.3d 1147, 1156-57 (9th Cir. 1995) ("[W]hen an author outlines the facts available to him, thus making it clear that the challenged statements represent his own interpretation of those facts and leaving the reader free to draw his own conclusions, those statements are generally protected by the First Amendment."); *Lauderback v. Am. Broadcasting Co.*, 741 F.2d 193, 195 (8th Cir. 1984) ("[G]iven all the facts of a situation, the public can independently evaluate the merits of even the most outrageous opinion and discredit those that are unfounded.").

1. The statements of fact contained in this report are true and correct.
2. The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions, and are my personal, unbiased professional analyses, opinions, and conclusions.

Because Brooker revealed the underlying facts on which his opinion relied, leaving readers of his appraisal free to form different opinions, we hold as a matter of law that the electricity statement is not defamatory.

With respect to the gated security statement, Brooker wrote: "Access along the [Goode property's] dedicated access easement . . . has not yet been developed[;] however there is no legal impediment to developing this access[,] and it would cross the Susitna Shores boat ramp en route to the subject." This statement is a straightforward interpretation of the maps Brooker included in his appraisal. In more speculative terms Brooker wrote:

> It is unknown exactly where the private road between the platted subdivision (north of the [Goode property]) and existing private boat launch site (south of the [Goode property]) runs relative to the [Goode property's] twenty-five foot access easement. . . . Subject site is assumed to have unimpaired access via the twenty-five foot easement discussed, although the access has not yet been developed.

As evidenced by his use of the terms "unknown" and "assumed," Brooker disclosed that he was uncertain where the Goode property's undeveloped easement ran in relation to Susitna Shores' road and boat launch. This uncertainty likely informed Brooker's speculative opinion that the Goode property's access easement "*could* be developed and *probably* left open, thereby defeating the gated subdivision." (Emphases added.) These cautionary terms serve as "clear signals" to the reasonable reader that Brooker's opinion was "nothing more than conjecture and speculation" based on his stated assumptions,

factual observations, and the informative maps and photographs he included in his appraisal.[80]

The appraisal also contains an excerpt from a 2007 public zoning hearing on road access to Susitna Shores: "[T]he proposed frontage road within Susitna Shores will not be private or gated, providing unimpeded access to Big Su River Road and the public campground. AKDOT/PF may require the frontage road to be extended along the Parks Highway when and if the south adjacent parcel [Goode property] is developed."

In sum, Brooker disclosed that: (1) he did not know the exact locations of the Goode property's access easement and the subdivision's existing road in relation to each other; (2) the Goode property's access easement was not developed; (3) if it were developed, it would cross Susitna Shores' boat ramp road; and (4) the minutes from a 2007 public zoning hearing referenced a "proposed frontage road within Susitna Shores" that would "not be private or gated." In reaching his opinion, Brooker clearly stated each underlying factual premise and even included hearing minutes and maps in his appraisal. None of these factual premises is defamatory, and Brooker's ultimate opinion does not suggest as its basis other undisclosed, underlying, and defamatory facts. We therefore conclude as a matter of law that this statement, like the electricity statement, is a non-defamatory opinion, a mere speculation drawn from the stated assumptions and uncertainties.

D.    **The Superior Court Did Not Abuse Its Discretion By Awarding Enhanced Attorney's Fees**.

"We have 'consistently held that both the determination of prevailing party status and the award of costs and fees are committed to the broad discretion of the trial

---

[80]    *See Levin v. McPhee*, 119 F.3d 189, 197 (2d Cir. 1997).

court.' 'Therefore, any party seeking to overturn a trial court's decision in this regard [bears] a heavy burden of persuasion.' "[81]

The superior court increased the Realtors' fee award to 35% of their actual fees or approximately $55,500. As the court explained:

> Because [Alaskasland's] claims lacked merit and because [Alaskasland] unnecessarily increased the cost of litigation through the extent of the asserted claims and the motion practice that necessarily resulted from these numerous claims, this court varies attorney's fees per Civil Rule 82(b)(3)(A), (E), (G), and (K) upwards to 35% of the reasonable actual attorney's fees incurred by the realtor defendants.[82]

The court also based the increased fee award on its observation that Alaskasland had brought "a complex lawsuit despite having sustained no damages."

Alaskasland raises three arguments against the fee award. It first argues that although the Realtors prevailed on each of the claims below, it was also a prevailing party because it succeeded in "compelling the removal of the Brooker appraisal from the internet." Alaskasland then asks us to exercise our discretion "and refrain from characterizing either [party] as the prevailing party, and from awarding [the Realtors] fees in this matter." Alaskasland conflates the standard of review for attorney's fees with the substantive law. This court reviews awards of attorney's fees for abuse of

---

[81]     *Schultz v. Wells Fargo Bank, N.A.*, 301 P.3d 1237, 1241 (Alaska 2013) (quoting *K & K Recycling, Inc., v. Alaska Gold Co.*, 80 P.3d 702, 721 (Alaska 2003); *W. Airlines, Inc. v. Lathrop Co.*, 535 P.2d 1209, 1217 (Alaska 1975)).

[82]     These provisions of Rule 82 permit a trial court to increase a fee award based on "the complexity of the litigation," "the attorneys' efforts to minimize fees," "vexatious or bad faith conduct," and "other equitable factors deemed relevant." Alaska R. Civ. P. 82(b)(3)(A), (E), (G), (K).

discretion,[83] and we " 'will not find an abuse of discretion absent a showing that the award was arbitrary, capricious, manifestly unreasonable, or stemmed from improper motive.' "[84] We similarly review the superior court's prevailing party determination for abuse of discretion.[85]

"The prevailing party is the one who has successfully prosecuted or defended against the action, the one who is successful on the main issue of the action and in whose favor the decision or verdict is rendered and the judgment entered."[86] Alaskasland sought to enjoin the Realtors from making the Brooker appraisal available online and brought six other claims each requesting damages in "an amount exceeding $100,000." In July 2013 the court deemed the injunction claim moot because "[t]he last time the Brooker appraisal was available for download to the public was December 2011," and the Realtors had since removed the appraisal from the realtor-only website.

But Alaskasland did not characterize the main issue of its lawsuit as the removal of the Brooker appraisal from the MLS website — it sought money damages. During oral arguments on the cross motions for summary judgment, counsel for Alaskasland suggested that expert reports would prove it suffered damages, arguing that when the Realtors used three of its photographs, they were actually misappropriating Alaskasland's entire Susitna Shores marketing effort. One expert's report asserted

---

[83]     *See, e.g.*, *Baker v. Ryan Air, Inc.*, 345 P.3d 101, 106 (Alaska 2015); *M-B Contracting Co. v. Davis*, 399 P.2d 433, 437 (Alaska 1965).

[84]     *Bush v. Elkins*, 342 P.3d 1245, 1251 (Alaska 2015) (quoting *ConocoPhillips Alaska, Inc. v. Williams Alaska Petroleum, Inc.*, 322 P.3d 114, 137 (Alaska 2014)); *see also Tobeluk v. Lind*, 589 P.2d 873, 878 (Alaska 1979).

[85]     *See, e.g.*, *Taylor v. Moutrie-Pelham*, 246 P.3d 927, 928-29 (Alaska 2011).

[86]     *Id.* at 929 (quoting *Progressive Corp. v. Peter ex rel. Peter*, 195 P.3d 1083, 1092 (Alaska 2008)) (internal quotation marks omitted).

Alaskasland had suffered over $350,000 in damages and itemized such things as "Inflated Land Purchase Costs," "Photograph Usage Cost," and "Advertising (Promotion) Usage Cost." Another expert's report arrived at a similar damages figure by calculating dollar amounts for Alaskasland's "Advertising costs," "Art preparation time," "Trade show and all other promotions," "Entrance sign," and website design and maintenance. But Alaskasland did not prevail on its claims. We cannot say the superior court abused its discretion when it determined the Realtors were the prevailing party.

Alaskasland next argues that the Realtors incurred unreasonable or unnecessary fees because the case did not go to trial; it was "not overwhelmingly complex"; and the Realtors employed four attorneys who made no efforts to minimize fees. But, as the superior court reasoned, the Realtors were merely reacting to the complexity of the novel legal theories Alaskasland pled. Alaskasland brought a common law misappropriation claim that has never been recognized in Alaska. Alaskasland also brought a conspiracy to defraud claim seeking $100,000 on the theory that the Brooker appraisal had been fraudulently altered to disparage Susitna Shores and force Alaskasland to "acquiesce[] to a greatly inflated purchase price for the [Goode property]." The Goodes listed their property for $146,000, and Alaskasland made an unsuccessful offer of $95,000. Alaskasland then had the Goode property independently appraised at $35,000 and, on the strength of that appraisal, made a $50,000 offer, which was also rejected. Despite its conspiracy to defraud claim, Alaskasland bought the property for $155,000 shortly before the superior court granted summary judgment to the Realtors.

The superior court, and not this court, is optimally positioned to resolve whether the fees charged were unnecessary or unreasonable and whether too many

attorneys were employed.[87]  Because of their "greater familiarity with the details of the case" superior courts have broad discretion in this area.[88]  Alaskasland's  argument on the excessiveness of the Realtors' fees fails to persuade us that the superior court abused its discretion when it concluded that the Realtors' fees were not excessive.

Finally, Alaskasland argues there are no grounds for an enhanced fee award.  "We have held that '[i]n general, a trial court has broad discretion to award Rule 82 attorney's fees in amounts exceeding those prescribed by the schedule of the rule, so long as the court specifies in the record its reasons for departing from the schedule.' "[89]  Citing Rule 82(b)(3)(A), (E), (G), and (K), the superior court awarded the Realtors "35% of [their] reasonably incurred actual attorney's fees" because Alaskasland failed to prove any damages to support its numerous claims and because those claims "lacked merit" and resulted in "unnecessarily complex" litigation. The complexity of the litigation alone could have supported the superior court's enhanced fee award.[90]  The court further reasoned that had it not enhanced the Realtors' fee award, future litigants would be encouraged to bring unnecessarily complex claims in hopes of "extort[ing] settlements" against the backdrop of extensive and costly motion practice.  The argument Alaskasland offers us, which cites no legal authority, does not persuade us that the

---

[87]     *Valdez Fisheries Dev. Ass'n v. Froines*, 217 P.3d 830, 833 (Alaska 2009).

[88]     *Id.*

[89]     *Johnson v. Johnson*, 239 P.3d 393, 400 (Alaska 2010) (quoting *United Servs. Auto. Ass'n v. Pruitt ex rel. Pruitt*, 38 P.3d 528, 535 (Alaska 2001)).

[90]     *See BP Pipelines (Alaska) Inc. v. State, Dep't of Revenue*, 327 P.3d 185, 197 (Alaska 2014) (" 'While we have occasionally expressed concern about the use of factor (A) — complexity of the litigation — to enhance fees . . . we have repeatedly upheld its use.' " (quoting *Ware v. Ware*, 161 P.3d 1188, 1199 (Alaska 2007))).

superior court abused its discretion when it awarded the Realtors 35% of their actual fees.

## V.    CONCLUSION

We AFFIRM the superior court's judgment.